448 So.2d 927 (1984)
Bobby Glen WILCHER
v.
STATE of Mississippi.
No. 54370.
Supreme Court of Mississippi.
February 15, 1984.
As Modified on Denial of Rehearing April 25, 1984.
*929 Robert N. Brooks, James E. Smith, Jr., Carthage, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, Dannye Hunter, Dist. Atty., Forest, for appellee.
EN BANC.
Part I, HAWKINS, Justice, for the Court:

GUILT PHASE
Bobby Glen Wilcher appeals from his conviction of the Capital Murder of Velma Odell Noblin and sentence of death. We affirm the guilt phase of the trial. We likewise affirm the sentencing phase.
The numerous issues raised on this appeal are discussed in order.

FACTS
Two Scott County ladies were brutally murdered on a dead-end rural road in a remote area of Scott County. They were requested by Wilcher to drive him to his parents home from a honky-tonk in Scott County and after he got into the car with them he persuaded them to drive to this area in the pretext of carrying him home.
On this appeal, the first point is:

CHANGE OF VENUE
The Defendant argues he was entitled to change of venue.
On May 11, 1982, a motion for a change of venue was filed, to which were attached nine (9) affidavits from residents of Scott County, each concluding with an opinion that the Defendant could not receive a fair trial in Scott County because of the notoriety, and that the murder victims were wellknown, respected, and had many kinsmen in the county.
At a hearing on the motion, the state presented eleven (11) witnesses supporting the contention of the state that there had been no prejudgment of Defendant to the extent that a fair and impartial jury could not be impaneled. The circuit judge overruled the motion, but also stated he would review the question again when the special venire was examined.
On July 26, 1982, the Defendant filed another motion for a change of venue, again overruled. The circuit judge noted *930 the prospective jurors "by and large" had formed no opinion on the guilt or innocence of the Defendant.
This Court has held the matter of granting the change of venue is within the sound discretion of the circuit judge, and there is no justification to reverse a circuit judge on such a ruling unless it "clearly appears" such discretion has been abused. Tubbs v. State, 402 So.2d 830 (Miss. 1981); Myers v. State, 268 So.2d 353, p. 357 (1972); Gallego v. State, 222 Miss. 719, 77 So.2d 321 (1955); Shimniok v. State, 197 Miss. 179, 19 So.2d 760 (1944).
Upon the conflicting evidence of this case, we cannot state there was an abuse of discretion in overruling the motion.

AUTHORITY OF THE CIRCUIT COURT TO TRY THE CASE AT A SPECIAL TERM
The Defendant was indicted at the regular March term of 1982 of the Circuit Court of Scott County. Following his arraignment the circuit judge announced to the attorneys that he anticipated calling a special term in the event the motion for a change of venue was overruled.
On July 1, 1982, the circuit judge entered an order calling for a special term of Circuit Court to convene July 26, 1982.
Upon appeal, the Defendant claims he was entitled to a "continuance" of his case until the next regular term in October, 1982. His argument, however, is premised upon the authority of the Circuit Court to try his case at the special term. The Circuit Court clearly had statutory authority to try this case at a special term. Miss. Code Ann. § 9-1-1.
Defense counsel's citation of Gortney v. City of New Albany, 171 Miss. 896, 158 So. 921 (1935), is misplaced, where an entirely different question was presented to this Court.
In our modern day, with the added rules of criminal discovery, and complexity and difficulty of trial under present procedures, there will be many instances in rural counties when it will not only be desirable but indeed necessary for some cause to be tried at other times than a regular term of court.

AUTHORITY TO EXCUSE A JUROR OPPOSED TO THE DEATH PENALTY
One juror stated unequivocally he was opposed to the death penalty to the extent that it would prevent his making an impartial decision on the Defendant's guilt, that he would not even consider the court's instructions, and that under no circumstances would he vote for the death penalty.
The only authority the Defendant cites in support of his assignment the circuit judge erred in excusing this juror for cause is the United States Constitution, the Sixth and Fourteenth Amendments.
There is no merit in this assignment. See Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); Witherspoon v. State, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Armstrong v. State, 214 So.2d 589 (Miss. 1968).

ADMISSIBILITY OF CONFESSIONS AND TANGIBLE EVIDENCE

BACKGROUND
Around 10:00 o'clock in the morning of Saturday, March 6, 1982, Bobby Easterling made an affidavit before Robert G. Wilkerson, a justice court judge of Scott County, charging that Bobby Wilcher did unlawfully "take and carry away 1  .38 cal. Colt with Guard over the Hammer". Judge Wilkerson then issued a warrant for the arrest of Wilcher on a charge of "Larceny", and delivered it to Mike Bennett, a deputy sheriff of that county. Bennett had other official duties at the time, and took the warrant to the sheriff's office, notifying the personnel there that "if anybody saw him, to pick him up". No one else executed the warrant, and later in the day Bennett upon inquiry learned the location of the Gene Wilcher home, and went there and arrested Wilcher around 3:00 p.m. En route to the jail, Wilcher asked Bennett *931 what "larceny was", and Bennett told him he did not know. When Wilcher was brought to jail, Bennett handed him a copy of the warrant.
Almost simultaneously to their arrival at the jail, two girls and a boy came into the sheriff's office and reported seeing two bodies. Bennett took Wilcher to a cell and went to the location of the bodies.
It so happened in the early morning hours of that March 6, Bobby Wilcher was stopped for speeding by a police officer. He was driving a car belonging to one of the victims. The officer observed two (2) women's purses on the front seat and a black bra on the back seat. Wilcher told the officer that he was hurrying to the hospital for treatment of a cut finger and requested that the officer escort him. Wilcher was covered with blood. The officer followed but radioed another policeman to meet him at the hospital. Upon arrival at the emergency room at 2:00 a.m., Wilcher gave the officers a blood-covered knife. This knife was kept by the hospital security guard until turned over to police the evening of March 6. Wilcher's nicked thumb was treated with a band-aid and he was released. After receiving this information implicating Wilcher, Glen L. Warren, sheriff of that county, and Otis Kelly, a deputy, took Wilcher from the jail to the sheriff's office shortly after 7:00 p.m. that Saturday evening. Wilcher was given the conventional Miranda warnings, which were read to him on a form and signed by him at 7:19 p.m. Wilcher declined to make any statement at the time.
Wilcher requested to see his parents, and the officers took him to the Gene Wilcher home. They stood in another room while Wilcher talked with his parents a short while, and then returned with Wilcher to the sheriff's office.
Wilcher was then presented with another Miranda warning which was read to him, and signed by him at 9:14 p.m. He then gave a statement which was written by Sheriff Warren and signed by Wilcher. This statement admitted killing both the victims with a knife.
The sheriff wanted to question him further shortly after 10:00 p.m. that evening. Another Miranda warning was given and Wilcher signed another standard form at 10:22 p.m., but declined to make any further statement.
Wilcher was nineteen years of age, married with one child, and separated from his wife. He moved from Louisiana into the home of his parents in the latter part of February, 1982, and had been living there about a week and a half before March 5. The residence was under the control of the father, Gene Wilcher. No rent was charged Wilcher by his father, and he was provided a bedroom occupied only by himself. There was no lock on the bedroom door, however, and other than the fact that only Wilcher slept in the bedroom, there was nothing about the room setting it separate and apart from the Gene Wilcher household.
Gene Wilcher telephoned the sheriff's office on Monday, March 8, for permission to talk with his son. Otis Kelly answered the telephone and while they were waiting for a response to this request, a conversation was had between Kelly and Gene Wilcher. In that conversation it developed that in the house there was some tangible property of importance to the law enforcement officers.[1]
Upon the invitation of Gene Wilcher, Kelly and Albert Harkey, a constable of that county, went to the Gene Wilcher home. Gene Wilcher escorted them to the bedroom, pointed to a styrofoam container on *932 the top of a chest-of-drawers, and said, "It's in here."
The officers took the container, and in it were a watch, two rings and a necklace belonging to the murdered victim Velma Odell Noblin.
After retrieving this jewelry, Warren and Kelly again attempted to talk with Wilcher that evening in the sheriff's office. At 8:54 p.m. Wilcher was again read the standard Miranda form, which he signed, but he declined to give any further statement to the officers.
On Thursday following, March 11, Warren and Kelly questioned Wilcher again, and again he was given a standard Miranda form beforehand. Upon this occasion, however, the sheriff did not read the form aloud to Wilcher, but Wilcher read it himself and signed it. Following this, he accompanied the officers, and at Wilcher's direction, they drove several miles out into rural Scott County onto a county unpaved road. At a certain point Wilcher pointed to a certain location in a ditch, and the sheriff got out and picked up two purses and a brassiere.
On their way back to the jail, Wilcher again requested permission to visit his mother, and the sheriff took him by the Gene Wilcher home where he had a short visit with his mother.
Upon their return to Forest, Wilcher gave a more detailed statement, written down by the sheriff and signed by Wilcher, in which he again admitted the savage murder of these two ladies in order to rob them.
According to Wilcher's confession after the ladies consented to drive him home from a night spot in that county, he had tricked them into driving down an isolated road, presumably in search of the location of his father's home. In a remote spot he stabbed them both to death.

COMPETENCY OF CONFESSIONS
Over defense counsel's objection, both statements, as well as the two purses and the brassiere, were introduced into evidence as part of the state's case in chief.
Upon this appeal the Defendant challenges the validity of the confessions, and the competency of the physical evidence, claiming his arrest was illegal, and that in obtaining the confessions the officers violated his Sixth Amendment right to counsel, and also that they were not free and voluntary, but resulted from coercion and promise of leniency.
The claim of illegal arrest arises from Miss. Code Ann. § 99-3-7, the pertinent part of which reads:
Any law enforcement officer may arrest any person on a misdemeanor charge without having a warrant in his possession when a warrant is in fact outstanding for that person's arrest and the officer has knowledge through official channels that the warrant is outstanding for that person's arrest. In all such cases, the officer making the arrest must inform such person at the time of the arrest the object and cause therefor. If the person arrested so requests, the warrant shall be shown to him as soon as practicable. [Emphasis added]
There was a sufficient compliance with the statute under the facts of this case when officer Bennett informed Wilcher he was being arrested for larceny, and gave him a copy of the warrant as soon as they reached the jail. See Boyd v. State, 406 So.2d 824 (Miss. 1981); and Torrence v. State, 283 So.2d 595 (Miss. 1973).
Wilcher does not contend there was no probable cause for his arrest on the charge of larceny, and the mere fact officer Bennett did not have all the information pertaining to the circumstances resulting in the issuance of the warrant at the time he apprehended Wilcher certainly does not vitiate the legality of his arrest. There is no statutory requirement for an arresting officer under the circumstances of this case to do more than Bennett did in effecting the arrest and subsequent thereto. In this day and age it would place an insuperable burden on arresting officers, when notified by *933 responsible law enforcement agencies that a warrant is outstanding for a particular person, to require the arresting officer to also know the background and circumstances resulting in the warrant. There is no such constitutional or statutory requirement. This is not a case of a person being arrested on some vague suspicion, never told anything, and being held incommunicado for some period of time. Nor is this a case in which an officer either wilfully or through gross ineptitude failed to perform a duty of disclosing the reasons for the arrest.
Probable cause existing, and a lawful warrant having been issued, this Court is not going to adopt some strained view of whether an arresting officer has sufficiently disclosed the reason he is making the arrest when there has been absolutely no prejudice or harm done the accused, in any event.
Finally, the arrest in this case was for an offense totally unrelated to the murder charge, as yet unreported when the arrest was made.
To address the remaining contention of the invalidity of the evidence, it is necessary to set forth the various witnesses' versions of the circumstances prior to the officers' conduct.
The circuit judge conducted a hearing out of the presence of the jury on the validity of the confessions. Officers Warren and Kelly testified the statements were made after complete Miranda warnings were given, there was no threat of any kind made, and no promise of reward or leniency was offered.
Wilcher testified he repeatedly made demand for an attorney, beginning with the first day when he was arrested. This was positively denied by Warren and Kelly. Bennett said he had no recollection of anything being said on the way to the jail except being questioned by Wilcher as to what larceny was, and he did not recall being asked anything about an attorney. Bennett arrested Wilcher upon the warrant for larceny, and had nothing to do with questioning him on the murder charge.
Wilcher testified Kelly threatened him by making menacing gestures towards him, likewise specifically denied by Kelly and Warren.
Finally, Wilcher testified the sheriff told him if he would cooperate, he could see his family every Tuesday night. Officer Kelly did recall the sheriff telling Wilcher he could see his parents on Tuesday night if he would cooperate.
Even if this remark were given the full import as argued by defense counsel, it hardly amounts to any promise of leniency. It is extremely difficult for us to perceive how such a limited promise could cause Wilcher to confess to such grave crimes, and indeed he makes no contention that he gave the statements as a result of this statement by the sheriff. See: Harrison v. State, 285 So.2d 889 (Miss. 1973); Brister v. State, 211 Miss. 365, 51 So.2d 759 (1951).
The sheriff's testimony puts the remark in an entirely different perspective. Warren testified Gene Wilcher came to see him following his son's indictment and after all questioning had been concluded, requested that he be permitted to see his son in private. After this conversation with the father, Sheriff Warren testified that on either that day or the day following he talked with Wilcher:
Well, I asked Bobby  I told Bobby that I would  if he would cooperate with me in jail, while he was up there in jail, and behave himself, that I would let him see his mother and daddy during the week at night for two or three weeks, so they could have some time to talk to each other in private, because on Sunday afternoon during visiting hours, and at that time our visiting hours were only one hour, and it was a large crowd of people always in the jail, and there was no place that they could have any privacy at all in the jail.
The sheriff's version was not refuted by Gene Wilcher. It also negates the claim that the sheriff's offer to let Wilcher's parents see them privately on non-visiting *934 nights had anything to do with an offer of leniency to secure a confession.
Following the hearing out of the presence of the jury, the trial court ruled the confessions and the tangible objects recovered in the ditch were admissible evidence. It is the function and duty of a trial judge to make a preliminary determination whether a confession was freely given by an accused, and this Court must respect his finding where the evidence is conflicting. See, Harrison v. State, 285 So.2d 889, p. 891 (1973). In this case the weight of the evidence strongly supports the ruling by the circuit judge that the confessions were voluntary and therefore competent evidence. The tangible objects recovered in the ditch as a result of Wilcher's confession were likewise admissible evidence.

ADMISSIBILITY OF JEWELRY
Over Wilcher's objection the jewelry consisting of a watch, two rings and a necklace belonging to Velma Odell Noblin were introduced into evidence by the state in its case in chief. Upon appeal it is contended this violated Wilcher's state and federal constitutional rights against unreasonable search and seizure.
It is undisputed that the officers went to the Gene Wilcher home at his express invitation. When they arrived, he promptly escorted them to the bedroom occupied by his son, and on his own, pointed to the container with the jewelry in it, and said, "It's in here."
Had Gene Wilcher been the defendant in this case, there could be no question about the legality of the officers' conduct.
The Defendant charges, however, Gene Wilcher did not have the authority to take the officers to the son's bedroom and point out the location of the jewelry, and that only the Defendant could give this permission. Scott v. State, 266 So.2d 567 (Miss. 1972), cited by the Defendant, and involving a search of a rented, locked room has no application here.
The bedroom was part of the Gene Wilcher household, and had been occupied but shortly over a week by the Defendant at the time. As between himself and his father, the Defendant had no independent right to occupy the bedroom. It was assigned to him by his parents when he returned from Louisiana. He occupied it under the gratuitious consent of his father, who could have required him to move to another room or vacate the home at any time.
This case is really no different to the father on his own volition delivering the jewelry to the law enforcement officers. But the father did not even want to so much as touch the jewelry. Instead, he directed the officers to it, and pointed it out. No constitutional rights of the defendant would have been violated if the father had personally delivered the jewelry to the sheriff.
The father also had a right to escort the officers to a room in his house, and the officers had a right to enter, and there have the father point to the jewelry in a container.
The validity of a search occasionally depends upon factual distinction seemingly as close as a razor's edge. Not this case. See: United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Bell v. State, 360 So.2d 697 (Miss. 1978); and Brown v. State, 358 So.2d 1004 (Miss. 1978).

ARREST FOR LARCENY
The Defendant complained prejudicial error was committed by the District Attorney asking on cross-examination if he was arrested for larceny on Saturday afternoon, March 6.
The contention of the Defendant throughout trial proceedings and in this Court had been he was mistreated by the law enforcement officers. Part of this alleged mistreatment was a failure to inform him of the reason for his arrest.
*935 In his direct testimony before the jury, Wilcher was asked about the conversation he had with the arresting officers from the time of his arrest until he was incarcerated. His only reply was that he had asked for a lawyer several times, without success.
Wilcher omitted from his relation of the conversation between himself and Bennett that he inquired what he was being arrested for, and Bennett's reply.
On cross-examination the state was permitted over the Defendant's objection to ask him if Officer Bennett advised him what he was being arrested for. He replied that he asked Bennett what he was being arrested for, and Bennett stated, "Larceny."
This was proper cross-examination. Wilcher himself on direct examination had testified he was placed under arrest by Bennett. He had also testified as to the entire purported conversation between himself and Bennett, and the other officers when he first got to the jail.
It was proper for the state to fill in the omission for two reasons. First, having told the jury on direct examination of his arrest, the state was entitled to cross-examine, absent some compelling reason or instruction of the court otherwise, to inquire what he was arrested for. This becomes pertinent in this case, because the record reflects the murders were not reported to the law enforcement officers until subsequent to the arrest of Wilcher. See: Shelby v. State, 402 So.2d 338 (Miss. 1981).

JURY ISSUE ON KIDNAPPING
The indictment charged Wilcher with murder while engaged "in the commission of the crime of robbery or an attempt to commit the crime of robbery of the said Velma Odell Noblin, and while he, the said Bobby Glen Wilcher, was engaged then and there in the commission of the crime of kidnapping of Kattie Bell Moore and the said Velma Odell Noblin."
Wilcher's confession stated he intentionally gave the victims the wrong directions to his home so as to get them into a deserted place, with the intent to rob them after he got them there. They followed his directions; he killed and robbed them.
By Instructions S-1A and S-7, the circuit judge submitted the issue of kidnapping to the jury. Instruction S-7 followed Miss. Code Ann. § 97-3-53 (1974 Supp.), the criminal statute on kidnapping.
The Defendant does not claim Instruction S-7 fails to correctly state the law. Rather his complaint is that insufficient evidence was adduced to make a jury issue on the kidnapping charge.
The basis of this claim is that no force was used by Wilcher to get the women into the car and, as they believed they were doing, to drive him to his parents' home.
Manifestly, if they had been either physically forced to leave with him, or left at gunpoint, it would have been kidnapping.
While it is true neither of these ladies ever knew they were not free to do as they pleased until Wilcher's show of violence, the actual fact is that they were Wilcher's prisoners from the time the car left the night club.
Under modern day statutes, including our own, the crime of kidnapping may be accomplished by trickery and deceit as well as by force.
A jury issue was made on whether Wilcher by his trickery intended to cause these to be ladies to be secretly confined against their will. See: Miss. Code Ann. § 97-3-53; Hughes v. State, 401 So.2d 1100, p. 1105 (Miss. 1981).
As to the evidence to the crime of kidnapping other than the confession, the physical facts, place of slaying, together with the confessions, established the corpus delicti of the statutory crime of kidnapping. See: Poole v. State, 150 So.2d 429, 246 Miss. 442 (1963), cited in McCraw v. State, 260 So.2d 457 (Miss. 1972).

*936 REFUSAL OF REQUESTED INSTRUCTION D-37
The Court refused requested defense Instruction D-37. Having granted the Defendant Instruction D-17, this point was adequately covered.[2]

DISTRICT ATTORNEY REFERRING TO DEFENDANT AS A "BUTCHER"
During the guilt phase of the trial, in closing the District Attorney argued: "Was he denied his rights? How can you treat a butcher any better than that?" (Vol. VIII, P. 1432)
Objection to this remark was promptly sustained by the circuit judge, who then overruled the motion for a mistrial.
Circuit judges are vested with discretion to determine whether a mistrial should be granted for an unnecessary inflammatory statement made by the prosecution in closing argument. We do not find any abuse of discretion in overruling the motion for a mistrial under the facts of this case. There were over twenty (20) wounds on the body of the victim.

AFFIRMED AS TO GUILT PHASE.
PATTERSON, C.J., WALKER and BROOM, P.JJ., BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE and ROBERTSON, JJ., specially concur.
ROY NOBLE LEE,[3] J., not participating.

ON SENTENCE PHASE PROPRIETY OF JURY INSTRUCTIONS

A.
Error is assigned on the granting at the conclusion of the sentencing phase Instructions S-1, S-2 and S-5 to the state, and in refusing Instructions D-14, D-15 and D-16 requested by the Defendant.
Chapter 458, Laws 1977 Miss. Code Ann. § 97-3-21, in effect at the time of the commission of the crime and the trial, provides in pertinent part:
(2) After hearing all the evidence, the jury shall deliberate on the following matters:
(a) Whether sufficient aggravating circumstances exist as enumerated in the subsection (5) of this section;
(b) Whether sufficient mitigating circumstances exist as enumerated in subsection (6) of this section, which outweigh the aggravating circumstances found to exist; and
(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.
(3) For the jury to impose a sentence of death, it must unanimously find in writing the following:
(a) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
(b) That there are insufficient mitigating circumstances, as enumerated in *937 subsection (6), to outweigh the aggravating circumstances.
In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) of this section and upon the records of the trial and the sentencing proceedings. If the jury does not make the findings requiring the death sentence, the court shall impose a sentence of life imprisonment.
* * * * * *
(5) Aggravating circumstances shall be limited to the following:
* * * * * *
(d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit ... any robbery, ... kidnapping, ...
* * * * * *
(h) The capital offense was especially heinous, atrocious or cruel.
(6) Mitigating circumstances shall be the following:
(a) The defendant has no significant history of prior criminal activity.
(b) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(c) The victim was a participant in the defendant's conduct or consented to the act.
(d) The defendant was an accomplice in the capital offense commited by another person and his participation was relatively minor.
(e) The defendant acted under extreme duress or under the substantial domination of another person.
(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
(g) The age of the defendant at the time of the crime.
Section 3. The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in the charge and in writing to the jury for its deliberation. The jury, if its verdict be a unanimous recommendation of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt. Unless at least one (1) of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is overcome by the finding of one or more mitigating circumstances, the death penalty shall not be imposed. If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life.
The Defendant's first complaint about Instruction S-1 and S-2 is that since the jury in the guilt phase of the trial had already determined beyond a reasonable doubt that he had murdered while committing the crimes of robbery and kidnapping, authorizing the same jury to again consider the same facts in the sentencing phase was placing him on trial twice for the same offense, and violated the double jeopardy proscription of the Fifth Amendment.[4]
*938 The defense cites no authorities in support of this contention. While it is true that the same jury had already determined beyond all reasonable doubt Wilcher was guilty of these aggravating circumstances in the guilt phase, and it might appear superfluous and a waste of time to require the jury to consider them again, the Legislature has prescribed this consideration in the sentencing phase as well, no doubt for humanitarian purposes.
Considering these aggravating circumstances again in the sentencing phase of the same trial did not constitute double jeopardy as contemplated in the Fifth Amendment of the U.S. Constitution. In Hill v. State, 432 So.2d 427 (Miss. 1983), at 441:

*939 [17] During the sentencing phase of the trial the state requested, and was permitted by the trial court, to have the jury consider all previous testimony and evidence adduced on the guilt phase. The trial judge permitted this, and no error was committed in doing so. See In re Jordan, 390 So.2d 584, 585 (Miss. 1980); Irving v. State, supra [361 So.2d 1360], at 1367 n. 1 [(Miss. 1978)]; and Jackson v. State, 337 So.2d 1242, 1256 (Miss. 1976).

ON SENTENCE PHASE

PROPRIETY OF JURY INSTRUCTIONS

B.
Wilcher next complains that Instructions S-1, S-2 and S-5 shift the burden of proof in the sentencing phase to the Defendant.[5]
On this contention it must be observed that Instructions S-1 and S-2 adhere to the wording of the Act itself. There was no statutory requirement that the jury must find beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstance. The Act required the jury to find first, however, beyond a reasonable doubt as to the existence of the aggravating circumstances. See: § 3, Chapter 458, Laws 1977.
Instructions D-15 and D-16 requested by the Defendant would have required the jury to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances.[6]
*940 Unfortunately for Wilcher, this argument has been rejected in Hill v. State, supra.[7] Moreover, in this case the Defendant was granted Instruction D-12 which gave the jury the unfettered discretion to determine whether or not the Defendant would be sentenced to life imprisonment, regardless of the evidence.
Complaint is also made that it was error to submit to the jury as an aggravating circumstance that the offense was "especially heinous, atrocious or cruel." There was sufficient evidence for the jury to consider this circumstance. See: Edwards v. State, 441 So.2d 84 (Miss. 1983), citing Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978).

WAS DEFENDANT DENIED RIGHT TO PERSONALLY ARGUE HIS CASE?
At the conclusion of the guilt phase of the trial, while jury instructions were being considered, one of Wilcher's attorneys made the following statement and request:
BY THE COURT: ... Do you have any motions, Mr. Brooks or Mr. Smith?
BY MR. BROOKS: I have one other once, Your Honor. It's very similar. The Defense anticipates that the Court will allow both the State and the Defendant a [sic] adequate time for argument; and, anticipating that, also anticipates that the Court will probably declare a recess sometime during the argument. Since the State has the first argument and the final argument, we would move the Court that, if a recess is declared, that it be declared between the two arguments that the Defendant is going to present. We will present  Mr. Smith will present our first argument; and then I'll present the final argument for us, anticipating that the State will then come back with a final argument. [Emphasis added]
[Record, Vol. VII, P. 1303]
Following this, the court asked how much time they desired for argument, the state said thirty (30) minutes to the side, and the defense requested an hour. The state had no objection to an hour, and the court granted it.
The record then discloses:
BY THE COURT: Then I will declare a recess between attorneys. Mrs. Amis here will be taking down the argument, and it's very difficult to take down that argument of the attorneys. So, I'll declare a recess after each attorney concludes his argument.

BY MR. BROOKS: After each? How long a recess now?
BY THE COURT: I don't know.
BY MR. BROOKS: In view of the Court's ruling I would make one additional motion.
Comes now the Defendant, being charged with capital murder which potentially carries the death penalty and moves for the right to make the final argument.

BY THE COURT: Motion over-ruled.
[Emphasis added]
[Record, Vol. VII, P. 1304]
On appeal defense counsel state the motion "for the right to make the final argument," was intended to be a motion by the accused that he be permitted to personally argue his case.
Obviously, the circuit judge did not so understand, because he promptly overruled it. Examining only what is set forth in the record, it appears counsel was speaking of *941 the order or sequence of argument, not that the defendant be permitted to personally argue his case.
First the defense counsel tells the circuit judge he anticipates the court allowing the "state and the Defendant" adequate time for argument, and also (no doubt because of extended argument in such a case as this), the court would "probably declare a recess sometime during the argument." He goes on to state that since the state "has the first argument and the final argument, "if a recess is declared that it be between the `two arguments that the Defendant is going to present'." He then concludes: "We will present  Mr. Smith will present our first argument; and then I'll present the final argument for us, anticipating that the state will then come back with a final argument."
The upshot of this colloquy was the decision of the circuit judge to declare a recess after each attorney concluded his argument. Defense counsel, for reasons best known to themselves, were interested in the recess. One then asked the court how long would the recess be. The circuit judge replied he did not know. Where upon, counsel promptly made the motion that Defendant be given the right to make the final argument.
In at least three (3) instances in this brief colloquy defense counsel refers to final argument and the Defendant's argument in its ordinarily accepted context, in other words by "final argument" he meant the concluding or rebuttal argument of the state, and by "Defendant's" argument he was referring to defense counsel, not the Defendant himself.
The circuit judge no doubt made the same interpretation of this request by defense counsel precisely as we would read it, absent the contentions of counsel in their briefs.
Trial counsel as officers of the court owe some duty to the circuit judge. With this ambiguity, preponderating in favor of the interpretation the trial court gave it, we are not going to fault a circuit judge. Trial counsel wishing to preserve an error are under some duty to see the record is made clear on the point. It is unfair to the circuit judge and to this court to ask us to construe an ambiguity, caused by themselves, solely in the Defendant's favor. We are not required to declare error from an opaque record. See Edwards v. Thigpen, 433 So.2d 906 (Miss. 1983); Carrol v. State, 391 So.2d 1000 (Miss. 1980); and Stringer v. State, 279 So.2d 156 (Miss. 1973).
Part II, PRATHER, Justice, for the Court:

CLOSING ARGUMENT IN THE SENTENCE PHASE
Appellant assigns two errors from the closing argument portion of the sentence phase:
(1) The trial court erred in sustaining certain objections during oral argument; and
(2) In excusing the jury during oral argument of appellant's counsel.

(1)
The facts of the first portion of this assignment can best be understood with a recital of the pertinent portion of the argument, as follows:
BY MR. SMITH: (Defense Counsel)
Six years ago when I was a senior in law school, I had a class trip. They carried us over to Parchman. Catch a bus in front of the law school about 7:00 o'clock in the morning, drive through the Delta, and you go over and visit the camps. You go in the front gate. We go through the camps, and one of the places they carried us was the maximum security camp and death row.
Now, we weren't allowed to go in and see the inmates on death row for security reasons, however, we were allowed to go around and view the gas chamber. I want to tell y'all about the gas chamber. (Emphasis added).
BY MR. HUNTER: (District Attorney)
I am going to object to Mr. Smith's argument about the gas chambers, Your *942 Honor. It's not an issue in this case, and it is not in evidence.
BY THE COURT:
Do you propose to argue to the jury the conditions of the chamber you viewed there in Parchman?
BY MR. SMITH:
I beg your pardon?
BY THE COURT:
Do you propose to argue to the jury the details of the gas chamber you viewed there on your Parchman?
BY MR. SMITH:
Some of the details, Your Honor.
BY THE COURT:
Objection sustained.
The first objection sustained by the court dealt with testimony of the conditions of the gas chamber at Parchman which the attorney had personally viewed as a student. The court properly sustained the state's objection to such description as not being supported in the evidence.
The appellant relies upon Gray v. State, 351 So.2d 1342 (Miss. 1977) as authority for the admission of facts judicially known to the court, but this reliance upon counsel's observations as a judicially known fact was misplaced. Counsel cannot state facts which are not in evidence, and which the court does not judicially know. Gray v. State, supra. A similar argument was advanced in Johnson v. State, 416 So.2d 383 (Miss. 1982). This Court in Johnson stated:
Defense counsel should not be unduly restrained in his closing argument at the punishment stage because this stage of the trial is for the purpose of determining whether a defendant will live or die. We reaffirm our previous holdings that counsel may draw upon literature, history, science, religion and philosophy for material for his argument; however, we refrain from deciding whether argument is limited to mere facts in evidence adduced at this stage of the trial.
The scope of appellant's argument in the case sub judice clearly exceeded the legitimate field of closing argument... . (416 So.2d at 392).
We hold that this attempted argument exceeded the legitimate field of closing argument. The sustaining of the objection was not reversible error.
The defense argument continues:
BY MR. SMITH:
The State of Mississippi has placed a terrible burden on you people. A terrible burden. Right now, I want each of you to look down at your hands. Right now. This very minute. Each of you. Look down at your hands. Hold your hands open and look down at them, just like this (indicating). The State of Mississippi wants to put blood on those hands.
BY MR. SMITH:
I object to that statement, Your Honor, and ask that the jury be instructed to disregard it.
BY THE COURT:
I will not sustain your objection at this time. I will let him continue.
Of course, you will have the right to renew your objection. You may proceed.
BY MR. SMITH:
One of the Scriptures that I am familiar with involves the death of Jesus Christ. After Pontius Pilate condemned Jesus to die, he went out and washed his hands of the matter. He washed his hands. How much good do you think that handwashing did? How much good do you think Pilate received from washing his hands? Soap and water didn't cleanse that. It was symbolic, but there was no cleansing.
There is no way that you can ever get over what the State of Mississippi is asking you to do to this man here today. No way. The State of Mississippi is asking you to take a human life.
BY MR. HUNTER:
Object to that statement and ask that the jury be instructed to disregard it.
BY THE COURT:
Over-ruled.
BY MR. SMITH:
They have a man who is hired to come and execute the sentence, if you will, of the jury. This man is paid by the State *943 of Mississippi to execute the sentence, and yet, I still don't think this man has the blood on his hands of another man. The burden is right here, right now. It is placed squarely on the shoulders of you people here in front of me. One of you is going to have to sign the verdict. One of you is going to have to sign his name to this man's death certificate. I don't know which one it is. (Emphasis added)
BY MR. HUNTER:
I object to that and ask the jury to be instructed to disregard it.
BY THE COURT:
I am going to let this jury be escorted to the jury room.
WHEREUPON, THE JURY WAS RETURNED FROM THE COURTROOM, AND THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE OF THE JURY:
BY THE COURT:
I am aware of my responsibility in this case. My responsibility is to rule fairly upon the evidence, to instruct the jury on the law to the very best of my ability. It is a position that I do not enjoy in a case of this type, to be called upon to rule on matters of fact and matters of law, when the ultimate decision could result in death.
I am also very mindful of the fact that at this stage of the trial of this case, that this Defendant is presenting a matter to the jury that based upon their decision, he could suffer death.
Therefore, the attorneys who argue the case, for a person charged with a crime such as this, is given more leeway to make that argument in the interest of his client.
In the trial of this case, as well as all cases, the State is entitled to a fair trial, as well as the Defendant. Under our law, if the State should make an error, of if this Court should make an error in its ruling, then there is a new trial, but the law also is that a Defendant can say and do anything under the sun, and there is no such thing as reversible error. He can walk up here and slap the Judge, shoot the Sheriff, run out the door, and there is no reversible error. Walk up there and spit in the face of the jury, and there is no reversible error.
But, still and all, we have rules of law, and one rule of law is that you cannot abuse the jurors.
I am ever mindful also, of a case that was recently decided by the Mississippi Supreme Court from your county, Leake County, that I tried. All Judges of the Supreme Court affirmed that conviction, except there was one dissenting Judge, who felt that in the argument of this stage of the trial, the attorneys could say anything that they wanted to.
However, I do not believe that it is in a sense of fairness to the people, and even of this Defendant, to accuse  which the law requires. The law requires whoever returns the death penalty, for someone to sign that verdict. We didn't write the law. The Legislature wrote the law, and it is a requirement. Someone has got to sign it. Someone has got to be designated, not by this Court, but chosen from among themselves, to sign that.
I certainly don't think it is fair to tell them they are signing a death certificate.
Therefore, I sustain that objection, and I am informing you not to say it again. You say it again, and you will suffer the wrath of this Court. (Emphasis added).
Now, bring in the jury.
I want to say this, while we are out of the presence of these jurors. These jurors didn't volunteer to come here. They were commanded by a summons to be here and appear, and when they stood at that rail, they qualified themselves as being law abiding citizens, that they had never committed a crime.
Bring in the jury.
WHEREUPON, THE JURY WAS RETURNED TO THE JURY BOX, AND THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE OF THE JURY:
BY THE COURT:

*944 For the purpose of announcement to this jury, the last objection that was made was sustained.
The trial judge sustained an objection to the defense counsel's reference to a juror signing the death certificate of the defendant if a death sentence were returned. The court's ruling on the objection came after the jury was excused, and the judge explained that he viewed the argument as a violation of the rule of law that jurors could not be abused.
The statement that a juror would have to sign a death certificate, if taken literally, is inaccurate. That statement is not a fact. It is possible to construe the statement as a figure of speech. But since this Court is uncertain as to whether the statement was intended to be construed literally or figuratively, a juror may also have been in doubt. No error is seen here in this ruling.

(2)
The trial court excused the jury from the courtroom during the defense counsel's oral argument before ruling on the objection to the statement about the death certificate. This action is assigned as error but defense counsel did not contemporaneously object at trial. Additionally, appellant does not support his argument with any authority in his brief.
We hold that since no objection was made at trial to the judge contemporaneously with the occurrence, it is barred from consideration by the appellate court. A trial judge will not be put in error in appellate review by an occurrence not addressed to him as erroneous at trial. Ponder v. State, 335 So.2d 885 (Miss. 1976), Ratliff v. State, 313 So.2d 386, 388 (Miss. 1975), Pittman v. State, 297 So.2d 888 (Miss. 1974), Myers v. State, 268 So.2d 353 (Miss. 1972), Sanders v. State, 260 So.2d 466 (Miss. 1972).
However, notwithstanding the failure to object at trial, we find no error. During the course of a trial, a trial judge excuses a jury at any time the court considers the admissibility of evidence. The judge by such action may better understand an objection or an argument for admissibility. The jury is not excused during oral argument as a usual rule, but this court can see no error in such action when the propriety of oral argument is raised as here.
We have reviewed the record and compared the death sentence with all decisions of this Court beginning with Jackson v. State, 337 So.2d 1242 (Miss. 1976), involving the death penalty. We conclude the death penalty for Bobby Glen Wilcher is not disproportionate, wanton or freakish when compared to other capital cases, their facts, these facts and the defendant. We are of the opinion from the evidence and the comparison, that the death penalty imposed by the jury is not excessive in relation to the aggravating and mitigating circumstances presented to it. (See appendix "A" attached)
We find no reversible error in the sentence phase.
The judgment of the lower court is affirmed and Wednesday, April 11, 1984, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED AS TO SENTENCE PHASE:
PATTERSON, C.J., WALKER and BROOM, P. JJ., BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE and ROBERTSON, JJ., specially concur.
HAWKINS, J., dissents as to sentence.
RAY NOBLE LEE,[8] J., takes no part.

APPENDIX "A"
DEATH CASES AFFIRMED BY THIS COURT:
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
*945 Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Williams v. State, 445 So.2d 798 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
DAN M. LEE, Justice, specially concurring:
I agree with the majority opinion but write specially to emphasize that while I agree there is no reversible error, I hasten to point out that the learned trial judge did unusually restrain defense counsel on final argument.
Certainly defense counsel should be allowed to emphasize the awesome responsibility facing the jurors by arguing "One of you is going to have to sign the verdict."
I also think the trial court was not justified in admonishing the defense counsel by saying "You say it again and you will suffer the wrath of this court." The language used by the defense counsel during final argument certainly does not justify this Court in holding or intimating that counsel was abusing the jurors.
Of course, finding no error, I concur in the guilt phase. Having no exact precedent, I specially concur in the sentencing phase. I do however note the above enumerated reservations I have concerning the actions of the trial court.
It is my fervent hope that all interested judicial personnel, the district attorneys, defense counsel and trial judges will take note.
ROBERTSON, Justice, specially concurring:
I concur unreservedly in the affirmance of the conviction of Bobby Glenn Wilcher *946 of the crime of capital murder. I likewise concur in the affirmance of the sentence of death imposed by the Circuit Court.
I write separately because of my concern that we may be improperly limiting defense counsel in final argument to the jury at the sentencing phase.
I consider that Justice Hawkins has correctly and eloquently stated what ought to be the law on this point, first, in his dissenting opinion in Johnson v. State, 416 So.2d 383, 393-399 (Miss. 1982), and now in this case. In my opinion, at the sentencing phase of a capital murder trial the defendant should be allowed to offer evidence of what will happen in the pre-execution ritual and in the execution process itself. He ought also to be allowed to argue these matters. Particularly ought this be so in a case such as this where the state seeks to establish the aggravating circumstance that the killing was done in an especially heinous, cruel and atrocious manner. Miss. Code Ann. § 99-19-101(5)(h) (Supp. 1983). We deal with a grisly business.
If the state is allowed to prove and argue all of the gory details of just how the victim died, it follows to my mind that the defense should be allowed to prove and argue how the defendant will die. If the prosecution is allowed to argue "An eye for an eye, a tooth for a tooth" [Exodus 21:24; Leviticus 24:20; Deuteronomy 19:24; contra Matthew 5:38-39], the defendant is entitled to have the jury know just what each eye and each tooth consists of, as well as the specifics of the extraction process.
On the other hand, I consider it one of the most elemental principles of justice that like cases ought generally be treated and decided alike. Edward Earl Johnson has been condemned to die in an opinion which authoritatively rejects the capital murder defendant's right to have his counsel argue the details of what will happen in the gas chamber. Johnson v. State, 416 So.2d 383 (Miss. 1982). I regard this decision as ill-advised and unnecessary. Still it is the law.
We now have a case before the court coming from the same circuit court district wherein the same point is presented. How could we in good conscience tell Edward Earl Johnson that he must die if we reversed Bobby Glenn Wilcher's death sentence on the same issue on which we affirmed in Johnson's case?
To be sure, there are times we should depart from the notion that like cases ought be treated alike. To my mind this is not one of those times.
DAN M. LEE, Justice, joins in this opinion.
HAWKINS, Justice, dissenting as to Part II:

RESTRICTIONS ON CLOSING ARGUMENTS
In his closing argument defense counsel was about to describe the gas chamber in Parchman, and objection to this line of argument was sustained.
The argument proceeded, there was another objection by the state, which the court did not then sustain.
The argument continued, and defense counsel, after informing the jury that the burden was upon their shoulders, told them one was going to have to sign the death certificate, he did not know which one.
Objection was again made, and the circuit judge directed that the jury be retired.
The circuit judge admonished defense counsel for his line of argument, and in the presence of the jury, sustained the state's objection to the statement that one of the jurors would sign the death certificate.[9]
In Gray v. State, 351 So.2d 1342 (Miss. 1977), Page 1346, we stated: "The trial judge should not interfere with argument unless counsel clearly and conclusively exceeds the legitimate field of the argument."
We repeated this statement in Johnson v. State, 416 So.2d 383 (Miss. 1982), and again quoted from Nelms & Blum Co. v. *947 Fink, 159 Miss. 372, 131 So. 817 (Miss. 1930), a civil case.
Limits do exist to the bounds of propriety and acceptable argument by defense counsel. The circuit judge has an inordinately difficult task in assuring that defense counsel has the widest possible latitude in argument, and yet recognize those rare cases when the borderline is crossed. Each case must be judged on its own.
In this case counsel was unduly restricted. He had a right in a death penalty case to describe the death chamber. He had the right to alert each member of the jury to the awesome responsibility resting upon his or her shoulders, and which only twelve (12) people shared. They and they alone would decide whether the Defendant would die at the hands of the state of Mississippi, or be sentenced to life imprisonment. This responsibility is not required to be minimized in any way, and it is not error for defense counsel to explain to the jury their responsibility.
The Constitutions of the United States and of Mississippi authorize the death penalty. The members of this Court are bound by oath to uphold these Constitutions.
This does not diminish the death penalty as a terrible punishment. Indeed, it is the ultimate punishment, the worst we as a state are authorized to impose.
What greater torment can be placed on a person than to place him in an isolated cell for months or years with the certain knowledge that on some specified date he will be put to death? If vengeance is the purpose of the law, it is imposed with profligate abundance on the convicted killer.
All that is missing in these circumstances is physical torture.
In making these observations I state no more than is profusely set forth in newspapers and on television. The public is spared none of the graphic details.[10]
Yet a jury may not be told this? It is abhorrent to me that a jury cannot be told this much in a trial court.
Just what is the majority doing to the legal profession and its ideals? The right, indeed the duty to vigorously and dramatically argue a case has been emasculated in that most somber of circumstance confronting a trial lawyer.
The majority justifies this evisceration by saying the description of the death chamber was not "supported in the evidence." This justification leaks.
Moreover, it is an invitation by this Court to trial counsel in all future cases to call the prison superintendent, the prison doctor who will be a witness and pronouncer of death, the executioner, and no doubt others, to make the ordeal of a convicted killer part of the record. What is the majority doing to trial judges who must preside over these criminals cases?
In my view defense counsel was entitled to make the argument he proposed as a legitimate, general argument.
In our rush to judgment in these most terrible cases, the majority confine defense counsel to some euphemistic argument.
The heat and passion of this brutal murder will eventually subside; the defendant will be punished.
The denial by this Court of perfectly legitimate argument in a Courtroom in a free society will not fade away. We must not ignore our own history, and what made us a free society.
I would hold the circuit judge's denial of the argument as set forth in the majority opinion a prejudicial infringement on the expression of defense counsel, and reverse the case for a new hearing on sentencing.

APPENDIX

AFTER YEARS OF LEGAL DELAYS, DEATH CAME IN JUST MINUTES

By GREG KUHL

JACKSON DAILY NEWS Staff Writer
PARCHMAN  Jimmy Lee Gray, the two-time killer whose travels took him *948 from California to Death Row, was executed early today in Mississippi's gas chamber.
Gray's death came at 12:18 a.m. after two Mississippi doctors monitoring stethoscopes decided that cyanide gas had killed Gray, who suffered cardiac arrest two minutes before.

* * * * * *
Gray, a 34-year-old former computer operator, appeared calm as he walked into the death chamber at the Mississippi State Penitentiary and was strapped into the black-oak chair by two officials from the Department of Corrections.
Gray, wearing a standard-issue red Death Row jumpsuit and brown tennis shoes with four tan stripes, spoke briefly with the two men as they secured his arms, chest and legs.
Gray, with a light growth of beard, refused to look at any of the 15 witnesses who watched from behind and to the side of the silver tank.
State executioner T.B. Bruce of Belzoni and three assistants, who wore gas masks that made them resemble World War I doughboys, were in an adjoining room. The doctors were behind another panel.
The formal countdown to Gray's death began in the witness room at 12:01 a.m. when Warden Eddie Lucas said "go ahead."
Seven minutes later, Gray entered the chamber. It was locked at 12:11 a.m. and the gas, which appeared briefly in a white plume, struck Gray's face at 12:13 a.m.

* * * * * *
Gray moaned and gasped for breath 11 times before prison officials ordered four reporters and other witnesses out of the witness room. Gray appeared to have been struggling for life when the witnesses were told to leave.
When reporters asked why they were being ordered to exit, Lucas said: "No questions."
Afterward, Balske, and the Rev. Joe Ingle, director of the Southern Coalition on Jails and Prisons, complained about what happened in the death chamber.
"They told me he was dead and he was not. He was trying to breathe and was strangling in there," Balske said.
"He suffered. I saw that. I heard him moaning. I just don't believe it as involuntary. He was breathing," Balske said.
Commissioner Morris Thigpen of the Department of Corrections, which oversees the state's prison system, said Gray's heart stopped after two minutes.
For the next five or six minutes, Thigpen said, Gray had "involuntary movement ... common to any person who has died."
Thigpen disputed claims from Balske and reporters that Gray appeared alive, saying, "We've got non-medical personnel attempting to describe when death occurred."

* * * * * *
At 1:02 a.m., Gray's body was removed from the chamber and loaded into a waiting hearse, which wound along a dirt road behind the maximum-security unit and then headed for a Natchez cemetery.
(Kuhl, After years of legal delays, death came in just minutes, Jackson Daily News, Sept. 2, 1983, at 1A, Col. 2.)

GRAY EXECUTED

EYEWITNESS ACCOUNT  HE FOUGHT IT
Jackson Daily News reporter Greg Kuhl was one of four news media witnesses who watched early today as Jimmy Lee Gray died in Mississippi's gas chamber. This is Kuhl's account.

By GREG KUHL

JACKSON DAILY NEWS Staff Writer
PARCHMAN  It was perhaps the cruelest irony: Jimmy Lee Gray, the cold-blooded child killer, looked so helpless. Almost like a child.
The mental image won't soon be forgotten: Gray, the two-time murderer whose own mother wanted him dead, gasping for life as cyanide gas engulfed him.
*949 His hands twitched. His neck veins stuck out. His head banged against a metal pipe. His moans echoed off the gas chamber walls. His face turned red. His life slowly ebbed away.
Death-penalty proponents say Gray got what he deserved for killing a 3-year-old Pascagoula girl seven years ago.
His lawyers and death-penalty foes say it was cruel and unusual punishment, and complained that people in a witness room were forced to leave while Gray appeared to struggle for life.
In some ways, Gray looked like an average 34-year-old: His jumpsuit hung somewhat loosely on his slender body. A light growth of beard, perhaps one or two days, dotted his face. His hair barely covered the bottoms of his ears.
When Gray was led into the silver chamber at Mississippi State Penitentiary at 12:08 a.m., he was dressed in a red Death Row jumpsuit, brown and tan tennis shoes, and white socks.
He was expressionless and sat passively as two Department of Corrections guards strapped two leather straps around each arm and leg. Another two straps were fastened across his chest.
Gray never looked at the witnesses watching from behind windowed panels.
Somehow, for the four reporters chosen by lottery in June to witness the execution, it left the feeling of watching an animal in a cage.

* * * * * *
It took about three minutes, though it seemed longer for some reason.
The reality of what was about to be witnessed still hadn't hit: Warm September evenings are for lounging around a backyard or watching the Jackson Mets. Not swatting mosquitos as big as jumbo jets and preparing to watch a killer die.
After a 30-minute briefing, the reporters were driven in a blue van about a mile to the penitentiary's Maximum-Security Unit, known here as "MSU."

* * * * * *
Once past the gates, a guard escorted the reporters around behind the Maximum Security Unit. It was a calm sight: A prisoner could be spotted through a window. A yellow shirt hung out on a clothes line.
Past that portion, another coterie of guards and prison officials waited. There was another security check before clearance into the witness room  a white room measuring about 20 feet by 12 feet.
Four lights hung from the ceiling, but only three were working.
The heat, quite simply, was stifling.
The room quickly filled: A state highway patrol investigator, guards, the warden, defense lawyer Dennis Balske. So did the other rooms: More guards, assistant executioners.
A telephone, which would go unused, sat several feet in front of the gas chamber. Presumably, it was a line in case somebody wanted to stop the proceedings.
At 12:08, all eyes riveted toward the silver tank. A moth fluttered inside near the left leg of the gas chamber's chair.
Gray either mumbled to himself or chatted briefly with the two guards strapping him into the chair.
At 12:05 a.m., or three minutes before Gray walked from a Death Row waiting cell to the gas chamber, the executioner mixed distilled water and sulfuric acid beneath the black, steel chair.
A stethescope protruded from a wall to Gray's left to the chair, which allowed two unidentified Mississippi doctors to monitor his heartbeat.
The assistant executioners donned gas masks, which gave them an eerie appearance of World War I doughboys ready to fight amid clouds of poison gas.
At 12:11 a.m., the door was locked behind Gray, and gas began to seep up from the floor.
Gray gasped for air, as his fingers twitched and his muscles contracted. He *950 would gasp 10 more times before reporters were led from the witness room.
At first, he attempted to breathe through his nose. But he later switched to his mouth during his struggle.
Three times during the eight minutes that reporters were allowed to watch, Gray appeared dead. But then his head would snap back.
At about 12:16, Gray let out a blood-curdling moan and jerked his head back violently against a pipe. He had hit the pipe before and after, but never so hard.
His face also turned red, and a vein bulged out on his neck. At the back of the witness room, defense lawyer Dennis Balske leaned against a wall and stared straight ahead.
Gray's left foot raised off the floor once, and his hands and fingers moved several times.
At about 12:18, Warden Lucas got a telephone call and moments later deputy warden Joe Cooke told reporters they had to leave  even as Gray, either dead or alive, struggled in his chair.
The reporters protested that Gray didn't appear dead, but when they asked Lucas why they were forced to leave, the warden said: "No questions."
It was 12:18 and Gray was dead, or at least they said he was.
The reporters, frustrated at their ejection, rode past the floodlights and back into the darkness.
(Kuhl, Gray Executed: Eyewitness account  He fought it, Jackson Daily News, Sept. 2, 1983, at 1A, Col. 4.)
NOTES
[1] According to Gene Wilcher, when he telephoned the sheriff's office, Kelly asked him if he had found any jewelry in the house, and Wilcher replied that he had. Kelly then asked Wilcher to bring it to the sheriff's office, and Wilcher replied (according to him) that he wanted nothing to do with it, and for Kelly to come and get it.

According to Kelly, Gene Wilcher telephoned and told him that he needed to come out to the house, there was something Kelly needed to see.
[2] These instructions are as follows:

INSTRUCTION NO. D  17
The Court instructs the Jury that this phase of the trial deals with the question of guilt or innocence of the accused of the capital crime with which he is charged. If you find the Defendant guilty of capital murder another hearing will be held to determine the sentence of the defendant. But if you find the Defendant guilty of a lesser charge or not guilty there will be no further hearing. [Record Vol. VIII, P. 1350]
INSTRUCTION NO. D  37
The Court instructs the Jury that upon the returning of a verdict by the jury finding the Defendant guilty of "Capital Murder", then the Court is required to conduct a separate sentencing hearing before the jury to determine whether the Defendant should be sentenced to death or life imprisonment. At this separate sentencing hearing the State and the Defendant may present evidence and arguments to the jury that relate to the sentencing. After hearing this evidence and the arguments, the jury will deliberate on the matter of whether the Defendant should be sentenced to death or life imprisonment.
However, if the jury returns any verdict other than "Capital Murder", then the evidence, arguments, and deliberations are ended and the trial is over, except for the action of the trial judge is required to take toward judgment and/or sentencing. [Record Vol. VIII, P. 1371]
[3] The homicide occurred in the home county of Justice Roy Noble Lee who is acquainted with the parties.
[4] State's Instructions S-1 and S-2 are as follows:

INSTRUCTION NO. S  1
Ladies and Gentlemen of the Jury, you have found the Defendant guilty of the crime of Capital Murder. You must now decide whether or not the Defendant will be sentenced to death or to life imprisonment. In reaching your decision, you must objectively consider the detail circumstances of the offense of which the Defendant was convicted as well as the Defendant himself. To return the death penalty, you must find unanimously that aggravating circumstances, which are those which tend to warrant the death penalty, outweigh the mitigating circumstances, those which tend to warrant the less severe penalty of life imprisonment. Consider only the following elements of aggravation in determing [sic] whether the death penalty should be imposed.:
1. The Capital offense was committed while the Defendant was engaged in the commission of or an attempt to commit the crime of robbery or kidnapping.
2. The Capital offense was especially heinous, atrocious or cruel.
You must unanimously find beyond a reasonable doubt and to a moral certainty that one or more of the preceding aggravating circumstances exist in this case to return the death penalty. If none of those elements are found beyond a reasonable doubt and to a moral certainty to exist, the death penalty may not be imposed. However, if one or more of those elements of aggravation is found beyond a reasonable doubt and to a moral certainty by you to exist, then you must consider whether there are mitigating circumstance which outweigh the aggravating circumstance, or circumstances. Consider all of the mitigating circumstances which you have heard or seen evidence about, any and all inferences flowing therefrom, and especially consider any and all mitigating circumstances which the Court instructs you by other instructions to consider, and in addition thereto, consider any other circumstance or combination of circumstances surrounding the life and character of the Defendant, or the commission of the offense for which he is charged, which you deem, in your discretion, to be mitigating on behalf of the Defendant, and consider any other matter brought to you before or during the trial of the case, which you, the jury, deem to be mitigating on behalf of the Defendant. You are not to consider yourselves as being restricted in determining what may be a mitigating factor to be by you considered as a mitigating factor.
If you unanimously find from the evidence that one or more of the elements of mitigation exists, then you must consider whether it outweighs the aggravating circumstances, if any, you may have found from the evidence beyond a reasonable doubt and to a moral certainty. You must unanimously find from the evidence beyond a reasonable doubt and to a moral certainty, before you may impose the death penalty, that the aggravating circumstance or circumstances, if any, are sufficient to impose the death penalty, and that there are insufficient mitigating circumstances to outweigh such aggravating circumstances. If you so find from the evidence beyond a reasonable doubt and to a moral certainty and unanimously, your verdict must be written on a separate sheet of paper, must be signed by the foreman, and must enumerate the aggravating circumstances you so find, and may be in the following form:
"We, the Jury, unanimously find that the aggravating circumstance(s) of ______________________ __________________________________________ (Here list the aggravating circumstances you find) _____________ _____________________ (is) (are) sufficient to impose the death penalty and that there are insufficient mitigating circumstance(s) to outweigh the aggravating circumstance(s), and we unanimously find that the Defendant should suffer death."
 _______________________________
 FOREMAN OF THE JURY
[Record, IX, pp. 1544-1546]
INSTRUCTION NO. S  2
The Court instructs the Jury that the killing of a human being without authority of law by any means or in any manner when done willfully, unlawfully, feloniously, and of malice aforethought, is Capital murder when done by any person while engaged in the commission of or an attempt to commit the crimes of robbery or kidnapping. These are the statutory elements of the Capital offense of which Bobby Glen Wilcher is charged. Proof beyond a reasonable doubt and to a moral certainty of the statutory elements of the Capital offense with which the accused is charged shall constitute sufficient circumstances to authorize imposition of the penalty of death unless the mitigating circumstances shown by the evidence outweigh the aggravating circumstances. You shall not be required to make a special finding of any mitigating circumstances in order to return a verdict that the accused should be sentenced to life in prison. However, before you may return a verdict that the Defendant, Bobby Glen Wilcher, should suffer the penalty of death, you must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the Defendant should suffer the penalty of death.
[Record, IX, pp. 1547-1548]
[5] State's Instruction S-5 is as follows:

INSTRUCTION NO. S  5
The Court instructs the Jury that if you find the Defendant should not suffer the penalty of death and find that the Defendant should suffer life imprisonment, your verdict should be written on a separate sheet of paper, need not be signed by you or any of you, and should be in the following form:
We, the Jury, find that the Defendant should suffer life imprisonment.
[Record, Vol. IX, P. 1551]
[6] Instructions D-15 and D-16 are as follows:

INSTRUCTION NO. D  15
SENTENCING PHASE
You have found the defendant guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death or to life imprisonment. In reaching your decision you must objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the defendant himself.
To return the death penalty, you must unanimously find from the evidence beyond a reasonable doubt that aggravating circumstances  those which tend to justify the death penalty  outweigh mitigating circumstances  those which tend to justify the less severe penalty of life imprisonment.
If you fail to find any aggravating circumstance unanimously and beyond a reasonable doubt and to a moral certainty or, if you find one or more aggravating circumstances unanimously and beyond a reasonable doubt, but after weighing the mitigating circumstances and the aggravating circumstances, one against the other, you fail to unanimously find beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances, then your verdict shall be written on a separate sheet of paper and be in the following form:
"We, the Jury, find the Defendant should be sentenced to imprisonment for life in the state penitentiary."
If after reasonable deliberation, you cannot aggree [sic] as to punishment, you should certify your disagreement to the Court and the Court shall, under the law, impose a sentence of imprisonment for life. Your verdict shall be written on a separate piece of paper in the following form:
"We, the Jury, after due deliberation, have been unable to agree upon the punishment and hereby so certify and request the Court to dismiss the jury from further deliberation.
REFUSED.
[Record, Vol. IX, pp. 1571-1572]
INSTRUCTION NO. D  16
SENTENCING PHASE
If you unanimously find from the evidence, beyond a reasonable doubt any one or more of the aggravating circumstances, and if, after weighing the mitigating circumstances and the aggravating circumstances, one against the other, you further find unanimously from the evidence beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances and that the death penalty should be imposed, your verdict shall be written on a separate sheet of paper, shall be signed by your foreman, and shall be in the following form:
We, the Jury, find unanimously and beyond a reasonable doubt the following aggravating circumstances: (List the aggravating circumstances, if any, which you unanimously find beyond a reasonable doubt from those listed in another instruction of the Court in the same language as they are listed.) ________________________________________ _____________________________________________________ _____________________________________________________ We, the Jury, further find unanimously from the evidence and beyond a reasonable doubt and to a moral certainty that after weighing the mitigating circumstances and the aggravating circumstances, one against the other, that the aggravating circumstances outweigh the mitigating circumstances and that the defendant should suffer the penalty of death."
 __________________________________
 FOREMAN OF THE JURY
REFUSED.
[Record, Vol. IX, Pp. 1573-1574]
[7] Patterson, Hawkins and Robertson dissenting.
[8] See Footnote 3.
[9] The relevant portion of the argument is set forth in the majority opinion.
[10] As a demonstration of this, see appendix for report on Jimmy Lee Gray's execution in the September 2, 1983, edition of the JACKSON DAILY NEWS.