484 So.2d 339 (1986)
William L. WILEY
v.
STATE of Mississippi.
No. 56373.
Supreme Court of Mississippi.
February 19, 1986.
Rehearing Denied March 19, 1986.
*341 James D. Franks, Hernando, for appellant.
Edwin Lloyd Pittman, Atty. Gen., by Amy D. Whitten and Marvin L. White, Jr., Sp. Asst. Attys. Gen., Jackson, and Robert L. Williams, DeSoto County Dist. Atty., Hernando, for appellee.
En Banc.
PRATHER, Justice, for the Court:
This case represents the second appeal of the charge of capital murder against William Wiley. In 1984, this Court affirmed unanimously the guilt phase of William Wiley's trial for capital murder of J.B. Turner, while in the commission of robbery. Wiley v. State, 449 So.2d 756 (Miss. 1984).
This Court reversed the original death sentence because of improper remarks made by the prosecutor. Upon retrial of the sentencing phase, Wiley was again sentenced to die. From that decision Wiley brings this appeal and assigns the following twelve (12) errors:
(1) That the court erred in refusing to grant a change of venue;
(2) That the trial court erred by improperly excusing juror No. 41, Leroy Payne, under Witherspoon examination;
(3) That the court erred in sustaining the district attorney's objection to defense counsel's opening argument regarding the jury's sentencing options;
(4) That the court erred by admitting into evidence over defendant's objection State's exhibits S-6, S-8, S-9, S-10, S-23, and S-24;
(5) That the court erred by allowing, over defendant's objection, witness Holt to testify concerning the illegality of defendant's shotgun;
(6) That the court erred by allowing, over defendant's timely objection, witness Marie Turner to testify as to the character of her late husband, the victim;
(7) That the court erred by refusing to grant defendant's jury instructions D-1, D-2 and D-3; and
(8) That the court erred in granting State's jury instruction C-3A, which includes aggravating circumstances which repeat one another.
(9) That the verdict of the jury was and is against the overwhelming weight of the evidence and contrary to law;
(10) That the sentence of death was imposed under the influence of passion, prejudice, and/or some other arbitrary factor;
*342 (11) That the evidence does not support the jury's finding of one or more aggravating circumstances set forth in instructions of law given to the jury;
(12) That the sentence of death was and is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

FACTS
During the early morning hours of August 22, 1981, J.B. Turner and his daughter, Patricia Harvey, were closing the small convenience store Mr. Turner operated from 7:00 a.m. until midnight in rural DeSoto County. After Mr. Turner had locked the front door, a waiting assailant stepped out from a hiding place near the southeast corner of the building and fired three shots from a .20-gauge, pump shotgun.
Mr. Turner, who was shot once in the back and once in the chest, died on the scene. Mrs. Harvey, who was struck about her head and upper chest, survived but was partially blinded. The assailant took a small money box that Mr. Turner had been carrying and fled. The money box contained $350 to $400.
During the ensuing days, friends and family members of Mr. Turner discovered several articles of evidence near the store. One such item was a .20-gauge, pump shotgun discovered in the weeds and bushes behind the store. A trace was conducted by the United States Treasury Department, Bureau of Alcohol, Tobacco, and Firearms who determined the owner of the shotgun to be William Wiley.
Several weeks later William Wiley was arrested in Memphis, Tennessee. Wiley confessed to the robbery and the murder, and he led law enforcement officers to the place where he threw away a money sack.
Wiley was first found guilty of aggravated assault on Mrs. Harvey and was sentenced to a thirty (30) year prison term. Then, in a bifurcated trial, Wiley was found guilty of capital murder and was sentenced by the jury to suffer the death penalty. Upon review of the murder conviction, this Court affirmed the guilt phase but reversed and remanded the sentencing phase for retrial. The Court found that the prosecutor committed reversible error in his closing argument to the jury when he commented on the reviewability of the death sentence by the State Supreme Court. Wiley v. State, 449 So.2d 756 (Miss. 1984).
The sentencing phase was retried and, the jury again unanimously agreed that Wiley should be given the death penalty. In conformity with Miss. Code Ann. § 99-19-101 (Supp. 1984), the jury returned the following verdict:
"We the Jury, unanimously find that the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of capital murder: That the Defendant actually killed J.B. Turner. That the Defendant intended that the killing of J.B. Turner take place. That the Defendant contemplated that lethal force would be employed. We the Jury, unanimously find that the aggravating circumstances of the capital offense as committed during the attempt to commit the crime of robbery; that the capital offense was committed for pecuniary gain; that the capital offense was especially heinous, atrocious and cruel, are sufficient to impose the death penalty, and there are insufficient mitigating circumstances to outweigh the aggravating circumstances and we unanimously find that the Defendant should suffer death.
From that decision, William Wiley perfects this appeal.

I.
Did the trial court err in refusing to grant a change of venue?
Prior to the trial of this case, Wiley sought, by motion, a change of venue. A hearing was held on that motion with the defendant presenting two witnesses and trial counsel, plus ten newspaper clippings.
Wallace Anderson, an Olive Branch attorney, testified that the case had been highly publicized and that it had been the *343 subject of local community gossip. Mr. Anderson further testified that the general community feeling was that there was no sufficient punishment for what William Wiley had done. Mr. Anderson concluded by stating his opinion that William Wiley could not receive a fair and impartial trial in DeSoto County.
Lucious Edwards, a Hernando attorney, testified that he had read numerous local newspaper articles discussing the Wiley case and, based on those articles, his opinion was that Wiley could not receive a fair trial in DeSoto County.
The district attorney then elicited testimony from all five of the DeSoto County supervisors. Each supervisor testified that Wiley could receive a fair trial in DeSoto County.
In addition to the elicited testimony, Wiley introduced ten newspaper clippings from the DeSoto Times and the Commercial Appeal. With the exception of the letter to the editor authored by Pat Freeman, each article appears to this Court to be a fair, accurate, responsible account of the news it purports to convey.
After each side had made its summation, the trial judge took the matter under advisement pending voir dire of the potential jury. Upon completion of the voir dire, the defendant renewed his motion for a change of venue. The motion was denied.
Recent decisions of this Court have reminded the public that, `when it is doubtful that a fair and impartial jury can be obtained in the county where a homicide has been committed, an accused on trial for his life "is but asking for his rights when he requests a change of venue".' Fisher v. State, 481 So.2d 203, 216 (Miss. 1985); Johnson v. State, 476 So.2d 1195 (Miss. 1985); Eddins v. State, 110 Miss. 780, 70 So. 898 (1916).
"[A] motion for change of venue ordinarily should be granted where, under the totality of the circumstances it appears reasonably likely that, in the absence of such relief, the accused's right to a fair trial may be lost." Fisher v. State, 481 So.2d at 220.
This Court has often held that the decision regarding a change of venue in a criminal proceeding is committed to the sound discretion of the trial judge. Winters v. State, 473 So.2d 452 (Miss. 1985); Cabello v. State, 471 So.2d 332 (Miss. 1985). However, Fisher demonstrated that the venue question is in the sound discretion, not the unfettered discretion, of the trial judge.
The question now to be answered is whether the trial judge abused his sound discretion in refusing to grant the defendant's change of venue motion. This Court holds that he did not. The defendant introduced three witnesses to testify that he would not receive a fair trial in DeSoto County, while the district attorney introduced five witnesses to the contrary. The number of witnesses introduced is not always indicative of the quality of a claim. But the trial judge found after voir dire of the jury that the panel represented a cross-section of the county and that, based upon the prospective juror's responses a fair jury could be drawn. In addition, the record does not reflect a saturation of media coverage as evidenced in Fisher and Johnson or that Wiley was tried in the newspaper before his trial.
For the aforementioned reasons, this Court holds that the trial judge did not abuse his sound discretion in refusing to grant the defendant's change of venue motion.

II.
Did the trial court err by excusing juror No. 41, Leroy Payne?
During the voir dire of prospective juror Leroy Payne, Mr. Payne answered numerous times that he would not consider the death penalty in the present case or any other case. Only after the defense attorney described a hypothetical situation in which Mr. Payne's family would be killed by a burglar did Mr. Payne show signs that he would even consider the death penalty. When the district attorney was allowed to *344 re-examine the prospective juror, Mr. Payne reaffirmed his conviction that he would not impose the death penalty.
Before Mr. Payne was excused, the following discussion took place:
THE COURT: Mr. Payne, I'm going to excuse you. I feel like that you made a fair expression of your feelings and I wish it had been a little more certain and a little more definite, but  obviously, you'd never be permitted to serve on a Jury of somebody who's harmed a member of your family. Do you tell me again that you're just opposed to the death penalty?
JUROR (Mr. Payne): Yes, sir.
THE COURT: You can't think of a situation outside of your family where you would vote for the death penalty or even give it serious consideration?
JUROR (Mr. Payne): No, sir.
Wiley contends the excusal of the potential juror was improper in light of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), because the potential juror admitted he would consider the death penalty in at least one circumstance  if his wife and three children were killed by a burglar.
The State contends the Witherspoon standard is no longer the appropriate federal standard for exclusion, having been supplanted by the more liberal standard recently enunciated in Wainwright v. Witt, 469 U.S. ___, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). But the State adheres to the position that Payne was properly excluded under both the Witt criteria and the Witherspoon test.
The U.S. Supreme Court re-examined the Witherspoon standard in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and concluded:
[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.
448 U.S. at 45, 100 S.Ct. at 2526, 65 L.Ed.2d at 589.
The U.S. Supreme Court recently reaffirmed the Adams standard in Wainwright v. Witt, in which Justice Rehnquist wrote:
We therefore take this opportunity to clarify our decision in Witherspoon, and to reaffirm the above-quoted standard from Adams as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment.
469 U.S. at ___, 105 S.Ct. at 582, 83 L.Ed.2d at 851.
Additionally, this Court recently commented on the Adams standard in saying, "Although the United States Supreme Court has refined the Witherspoon decision in Adams, the issue remains the ability of the prospective juror to follow the instructions and the jurors oath." Gray v. State, 472 So.2d 409, 421 (Miss. 1985).
The record indicates that Payne would have been substantially impaired in the performance of his duties as a juror in accordance with his instructions and his oath. For that reason, this Court concludes that it was not error to exclude Mr. Payne for cause.

III.
Did the court err in sustaining the district attorney's objection to defense counsel's opening statement regarding the jury's sentencing options?
During the opening statement of Mr. Franks, the defense counsel, the following exchange took place:
COUNSEL FOR DEFENDANT (Mr. Franks):
.....
You do not have the choice of letting William Wiley go. You do not have that option. You can sentence him to one or the other of the two most severe penalties that we have under our system of *345 law in the State of Mississippi. You can sentence him to life at Parchman, Mississippi ... (Emphasis added).
DISTRICT ATTORNEY (Mr. Williams): Objection, Your Honor. Now, that is not what... .
COUNSEL FOR DEFENDANT (Mr. Franks): I'd like to be heard in Chambers on that.
DISTRICT ATTORNEY (Mr. Williams): ... That is not an accurate statement of the law.
IN CHAMBERS
DISTRICT ATTORNEY (Mr. Williams): Yes, sir. Your Honor, in the Defendant's opening statement and I will have to paraphrase, Mr. Franks informed the Jury that the Jury had two options, both of which are the most severe penalties for a violation of the criminal law. Number One being the death penalty and Number Two being to sentence the Defendant to spend his life in the penitentiary. This is a mis-statement. As Mr. Franks well knows, that life when used in the context of a sentencing order in a capital murder case means that the Defendant is eligible for parole after ten years. It is clearly an effort to mis-lead the Jury and have them believe that should they impose life imprisonment as punishment in this case, the Defendant would spend the rest of his natural life in Parchman in the penitentiary. It's an effort to take and [sic] unfair advantage ...
.....
THE COURT: Let the record show that the Court sustains the objection and directs Counsel for Defendant not to further make reference with any language which would lead the Jury to believe that a life sentence would effectively remove Wiley from society forever by giving him life in prison.
.....
The Court will instruct the Jury upon returning to the bench that the only alternative they have, if they can reach a verdict at all, will be the death penalty or life imprisonment, and direct the attorneys to address themselves in that context.
.....
IN OPEN COURT
(The following proceedings were held in open Court. The Defendant was present and seated at counsel table with his attorney. The jury was in the Jury Box.)
THE COURT: Ladies and Gentlemen of the Jury, I'll again instruct you at this time, the Jury reached a verdict in this case and the two options the Jury will have will be the death penalty or life imprisonment. If the Jury got any other interpretations on the statements made a moment ago, those statements were incorrect and I sustained the objection to this statement. The options will be the death penalty or life imprisonment. You may continue.
In making his ruling, the trial judge relied on a portion of Caldwell v. State, 443 So.2d 806 (Miss. 1983)[1], which reads:
We note here that defense counsel's closing argument for Bobby Caldwell in the present case stated that the jury should effectively remove Caldwell from society forever by giving him a sentence of life imprisonment. This is an obvious inaccuracy and misstatement of the law because there is almost always a possibility of parole in every case, except cases involving persons convicted and sentenced as habitual criminals.
Id. at 813.
Wiley argues that the statements made by the defense attorney in the present case were entirely different from the ones made in Caldwell. Furthermore, Wiley argues that the present case is not controlled by *346 Caldwell, but is controlled by Wiley v. State, 449 So.2d 756 (Miss. 1984). [hereinafter cited as Wiley I]
As mentioned before, Wiley I dealt with a situation in which the prosecutor in his closing argument made improper comments regarding the reviewability of the death sentence by the State Supreme Court. In that context this Court held:
It has been argued that the prosecutor's comments in the instant case were invited when defense counsel argued that the jury should vote to sentence Wiley to "spend the rest of his life in prison in Parchman, Mississippi." This notion is meritless. The only statutory alternative to imposition of the death sentence is life imprisonment. Miss. Code Ann. § 99-19-101 (Supp. 1983). What twisted bit of logic it would be for us to hold that the defense counsel's sole argument to save his client's life is an invitation to error.
449 So.2d at 762.
Appellant argues strenuously that he is being denied the opportunity to argue the "only statutory alternative to imposition of the death penalty." A close inspection of the record reveals, however, that Mr. Franks was instructed not to use language "which would lead the jury to believe that a life sentence would effectively remove Wiley from society forever by giving him life in prison." Furthermore, in open court, the judge instructed the jury, "The options will be the death penalty or life imprisonment."
The judge sustained the district attorney's objection and instructed Mr. Franks not to use language which would lead the jury to believe something that was not necessarily true. The judge then made a clear and accurate statement to the jury of what the jury's options were. This Court finds no error in the actions of the judge.

IV.
Did the trial court err in admitting into evidence, over the defendant's objection, exhibits S-6, S-8, S-9, S-10, S-23, and S-24, depicting the lifeless body of J.B. Turner and the blood of Patricia Harvey, his daughter?
Wiley contends the introduction of those photographs was reversible error because the photographs had no probative value due to the fact that in the present case the death of the deceased was not in controversy. Appellant contends the State introduced the photographs to inflame the minds of the jurors.
Wiley relies on Williams v. State, 354 So.2d 266 (Miss. 1978), in which this Court held:
Although considerable discretion is vested in trial judges as to the admissibility of photographs of the corpse of a homicide victim, such items can have no probative value upon a record such as this where the killing is not disputed in any respect.
Id. at 267.
Recently this Court stated in Cabello v. State, 471 So.2d 332 (Miss. 1985), "As a general rule the admission of photographs is within the discretion of the trial court. However, `gruesome photographs which have no evidentiary purpose and which only arouse the emotions of a jury should not be admitted... .'" Id. at 341.
This Court concludes that the photographs in question were sufficiently probative and that the trial court was not in error in allowing them to be introduced into evidence.

V.
Did the trial court err in allowing witness John Holt to testify concerning the barrel length of Wiley's shotgun?
During the direct examination of State's witness John Holt, the following exchange took place:
Q. Agent Holt, how long have you been with the A[lcohol], T[obacco], and F[irearms Bureau of United States Treasury Department]?
A. Since 1965.
Q. What is the legal length of a barrel on a shotgun?
A. Eighteen inches.

*347 Q. Do you have a measuring stick with you?
COUNSEL FOR DEFENDANT (Mr. Franks): Your Honor, I'm going to object to that. I think they're attempting to prove another crime for some reason. I don't think it's proper.
ASSISTANT DISTRICT ATTORNEY (Mr. Kelley): Your Honor, in opening statement Defendant said this was a sawed-off shotgun. I'm simply trying to substantiate his claim.
COUNSEL FOR DEFENDANT (Mr. Franks): A sawed off shotgun is not necessary illegal. It sort of depends on the length it was sawed-off.
ASSISTANT DISTRICT ATTORNEY (Mr. Kelley): Can the witness measure it?
THE COURT: I overruled the objection. I don't see anything improper about it.
Q. What is that measurement, sir?
A. Sixteen and a quarter inches.
Q. When you saw off the barrel of a shotgun such as that, does that increase its killing effectiveness at close range?
COUNSEL FOR DEFENDANT: (Mr. Franks): Object, Your Honor. He's not qualified for ...
THE COURT: There's been no predicate laid for that type of testimony. I sustain the objection.
Wiley contends the State's questioning "was an intentional effort by the Prosecution to present to the Jury evidence of a crime other than that on which the Defendant was being tried." Wiley further argues, "The only possible reason for such a question would be to show that the Defendant was breaking several laws and committing several crimes."
Conversely, the State "suggests that the complete context of the questioning reveals the ultimate goal of the question was to solicit the fact that a sawed-off barrel produces enhanced danger and a more severe wound when fired than does a barrel of regular length."
The State argues further that if the questioning had continued in the direction of proving Wiley was wielding an illegal weapon, the evidence would have been proper to show intent and motive since a person armed with a sawed-off shotgun has an exaggerated power to inflict harm.
Miss. Code Ann. § 97-37-1 (1972) prohibits any person from carrying, concealed in whole or in part, a shotgun with a barrel of less than 18 inches. The testimony of Mr. Holt, elicited by the assistant district attorney, tended to prove Wiley was committing a separate crime in addition to the one for which he was on trial. "Evidence of prior offenses committed by a defendant, not resulting in a conviction, is generally inadmissible either for impeachment purposes or as a part of the State's case in chief." Neal v. State, 451 So.2d 743, 758 (Miss. 1984). Neal goes on to explain:
Proof of another crime is admissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences. Such proof of another crime is also admissible where it is necessary to identify the defendant, where it is material to prove motive, and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge.
Id. at 759.
Taken in its proper context, the testimony under analysis seems to, as the State argues, solicit the fact that a sawed-off shotgun is more dangerous than one with a barrel of regulation length. This Court finds no reversible error in allowing the testimony to be given.

VI.
Did the trial court err in allowing Marie Turner to testify regarding the character of the victim?
*348 During the direct examination of Marie Turner, the widow of the victim, the following exchange took place:
Q. How old was Mr. Turner at the time of his death, Mrs. Turner?
A. Sixty.
Q. Sixty years old? Mr. Turner wasn't a violent person, was he?
A. No sir.
COUNSEL FOR DEFENDANT (Mr. Franks): Objection, Your Honor.
THE COURT: I overrule the objection at this point in time.
Q. He wasn't a mean person, was he?
A. No, I can't say that he was, no, sir.
Q. As a matter of fact he was a mighty good man, wasn't he, Mrs. Turner?
A. Yes.
Q. As a matter of fact, Mrs. Turner, Mr. Turner was known far and wide as "Mr. Good Buddy," wasn't he?
COUNSEL FOR DEFENDANT (Mr. Franks): I'm going to object to all of that, Your Honor, for the reason stated earlier regarding relevancy.
THE COURT: I overrule the objection.
COUNSEL FOR DEFENDANT (Mr. Franks): Thank you.
Q. Did he have a nickname, Mrs. Turner?
A. Several  Just what you said.
Q. Mr. "Good Buddy."
A. Right.
Q. Did Mr. Turner loan people money from time to time?
A. Very little.
COUNSEL FOR DEFENDANT (Mr. Franks): Objection again, Your Honor.
THE COURT: I sustain the objection regarding relevancy.
Wiley argues that the character of the victim in no way relates to the eight aggravating circumstances enumerated in Miss. Code Ann. § 99-19-101(5) (Supp. 1984). He further argues, "The questions were an obvious attempt by the Prosecution to circumvent the statutory restrictions, and sway the Jury with passion by causing the Jury to sentence out of pity for the victim."
The State concedes that the questions were "less than proper under the circumstances" but argues that the error was hardly prejudicial, especially in light of the overwhelming evidence against the appellant.
"Ordinarily the character or reputation of the deceased person is not involved as part of the issue in a murder case, and proof relative thereto is generally inadmissible." Shinall v. State, 199 So.2d 251, 257 (Miss. 1967). See also, Hubbard v. State, 288 So.2d 716 (Miss. 1974). It is generally agreed that the prosecution cannot enter proof of the good character of the decedent as part of its main case. McCormick, McCormick on Evidence § 193 (2nd ed. 1972). See also, 40 Am.Jur.2d Homicide § 308 (1968) (Before the character of the deceased has been attacked by the defendant, the prosecutor may not introduce evidence of the reputation of the deceased for peacefulness.)
Thus, it appears the admission of the character evidence was in error. The gravity of that error, however, does not arise to the level of being a reversible one.

VII.
Did the court err in refusing to grant defendant's jury instructions D-1, D-2, D-3?

A.
Jury instruction D-1 states, "The Court instructs the jury that every reasonable doubt you may have regarding any evidence in this case must be resolved by you in favor of William Wiley and against the state."
Jury Instruction D-1 was refused because the "reasonable doubt" standard was given in Jury Instruction C-3A. Wiley contends Instruction D-1 was intended to complement Instruction C-3A and was intended to help insure that the jury did not lose sight of which party had the burden of proof. On this point the State correctly *349 points out that, "It is well established that the trial court is not required to grant several instructions on the same question in different verbiage." Cunningham v. State, 467 So.2d 902, 906 (Miss. 1985).

B.
Jury instruction D-2 states:
The court instructs the jury that if you find aggravating circumstances, and if you then find insufficient mitigating circumstances to outweigh the aggravating circumstances, you are still not required by law to return a verdict of death. You may nonetheless grant William Wiley mercy.
Wiley argues that the Court was in error in refusing to inform the jury of its authority to grant mercy. An identical claim was recently denied in Cabello v. State, 471 So.2d 332 (Miss. 1985), in which this Court, quoting Billiot v. State, 454 So.2d 445, 466 (Miss. 1984) stated, "This jury came to the conclusion that the aggravating circumstances justified the death penalty and they did not conclude that they had no other choice but to impose it." As noted in Jordan v. State, 464 So.2d 475 (Miss. 1985), this argument is not new and has been addressed and resolved against each defendant that has raised the issue. Wilcher v. State, 448 So.2d 927 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983). Additionally, the Fifth Circuit Court of Appeals rejected the same argument in Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982).
Recognizing that the argument addressed here arises from the due process violation that was held violative of the Eighth Amendment to the U.S. Constitution in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), this Court reiterates what has been previously stated by this Court in Jackson v. State, 337 So.2d 1242 (Miss. 1976), and its progeny. In Jackson v. State, this Court stated:
The jury shall not be required to make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison. However, before the jury may return a verdict that the defendant should suffer the penalty of death, they must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death.

Id. at 1256.
In Coleman v. State, 378 So.2d 640 (Miss. 1979), we stated:
If the state merely proves the existence of an aggravating circumstance, the jury is free to find it insufficient to warrant death and is not required to automatically impose death. Mississippi's capital murder statute leaves the appellant the option of presenting evidence (mitigating circumstances) on why the death penalty should not be imposed, without requiring him to do so.

Id. at 646.
Although this Court has held that no reversible error is committed in refusing a mercy instruction, the granting of such would further refine and direct the jury's discretion in sentencing between those cases in which the death penalty is given and those in which it is not.
Following Cabello, the court committed no error in refusing the life option instruction.

C.
Jury instruction D-3 states, "The court instructs the jury to return a verdict of life imprisonment."
The standard for considering peremptory instructions was recently reiterated in Belino v. State, 465 So.2d 1043 (Miss. 1985), quoting Carroll v. State, 396 So.2d 1033 (Miss. 1981):
In determining whether a peremptory instruction should be granted and whether the verdict is contrary to the overwhelming weight of the evidence, the Court is required to accept as true all of the evidence favorable to the State, together *350 with reasonable inferences arising therefrom, to disregard that evidence favorable to the defendant, and, if such evidence will support a verdict of guilty beyond reasonable doubt, the peremptory instruction should be refused. [Citations omitted].
Id. at 1035.
This Court believes the factual issues of this case were properly put to the jury to decide.

VIII.
Did the court err in granting State's jury instruction C-3A, the court's sentencing instruction?
The instruction in part is as follows:
A.
To return the death penalty in this case, you must first unanimously find from the evidence, beyond a reasonable doubt, that one or more of the following facts existed:
1.) That the Defendant actually killed J.B. Turner;
2.) That the Defendant intended that the killing of J.B. Turner take place; and
3.) That the Defendant contemplated that lethal force would be employed.
B.
Next, to return the death penalty, you must find that the mitigating circumstances  those which tend to warrant the less severe penalty, life imprisonment  do not outweigh the aggravating circumstances  those which tend to warrant the death penalty.
Consider only the following elements of aggravation in determining whether the death penalty should be imposed:
1.) Whether the Capital Offense was committed during the commission of an attempt to commit the crime of Robbery;
2.) Whether the Capital Offense was committed for pecuniary gain;
3.) Whether the Capital Offense was especially heinous, atrocious or cruel;
4.) Whether the Defendant was previously convicted of a felony involving the use or threat of violence to the person.
You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exist in this case to return the death penalty. If none of these aggravating circumstances is found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper:
"We, the jury, find the Defendant should be sentenced to life imprisonment."
If one or more of these aggravating circumstances is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances. Consider the following elements of mitigation in determining whether the death penalty should not be imposed:
1.) The age of the Defendant at the time of the crime;
2.) Any other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought before you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the Defendant.
3.) The Defendant has no significant history of prior criminal activity prior to August 22, 1981, being the date of this incident.
If you find from the evidence that any one or more of the preceding elements of mitigation exist, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.
*351 Defense counsel addresses two areas regarding this instruction challenging (A) repetitive aggravating instructions and (B) the failure to define the burden of proof.

A.
Wiley contends that the following aggravating circumstances are repetitious and mutually inclusive:
(1) Whether the Capital Offense was committed during the commission of an attempt to commit the crime of Robbery.
(2) Whether the Capital Offense was committed for pecuniary gain.
The assertion that inclusion of both robbery and pecuniary gain as aggravating circumstances represents a doubling or stacking of the same factor and should be held by this Court to be improper.
Under Miss. Code Ann. § 99-19-101(5) (Supp. 1985) only eight aggravating factors enumerated in the code are permitted to be submitted to a sentencing jury and then only if the facts of the particular case warrant their submission. Those enumerated eight aggravating circumstances in which a sentencing jury may consider death as an alternative in sentencing are:
(a) The capital offense was committed by a person under sentence of imprisonment.
(b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.
(c) The defendant knowingly created a great risk of death to many persons.
(d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of section 97-5-39, or the unlawful use or detonation of a bomb or explosive device.
(e) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
(f) The capital offense was committed for pecuniary gain.
(g) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
(h) The capital offense was especially henious, atrocious or cruel.
The legislation permits both aggravating factors of pecuniary gain and robbery as two distinct and separate circumstances. This Court has addressed this charge in previous cases and found that it does not constitute a stacking of the same factor, but does constitute distinct separate aggravating circumstances. Gray v. State, 472 So.2d 409 (Miss. 1985); Jordan v. State, 464 So.2d 475 (Miss. 1985); Irving v. State, 441 So.2d 846 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Gilliard v. State, 428 So.2d 576 (Miss. 1983); Smith v. State, 419 So.2d 563 (Miss. 1982). The fact that two circumstances are distinct and separate is more apparent when the underlying felony is one other than robbery, i.e. rape, kidnapping, etc. This Court has followed the statute in interpreting this assertion and finds no merit to this argument. However, attention is called to the bench of this defense claim for the close scrutiny by the trial judge in submission of aggravating circumstances of both robbery and pecuniary gain.
However, the more convincing argument on this issue is Miss. Code Ann. § 99-19-101(7) (Supp. 1985) which states that the jury must find the existence of only one aggravating circumstance to return a death sentence. In this case two aggravating circumstances were found to exist even if robbery and pecuniary gain are considered to be only one factor. Thus, the failure of one repetitious aggravating circumstance does not invalidate the two remaining aggravating factors to reverse the death sentence. *352 Edwards v. State, 441 So.2d 84 (Miss. 1983). See also, Henry v. Wainwright, 721 F.2d 990 (5th Cir.1983) rejecting this same argument as a question of state law.

B.
In addition, Wiley argues that jury instruction C-3A fails to instruct the jury as to the burden of proof in weighing the aggravating and mitigating circumstances. In that regard, Wiley's position is that the jury should employ the "beyond a reasonable doubt" standard. Wiley bases this argument on the dissenting opinions of Justice Robertson and Justice Hawkins in Hill v. State, 432 So.2d 427 (Miss. 1983).
The majority in Hill, held, "[T]he sentencing statutes, Mississippi Code Annotated §§ 99-19-101 and 99-19-103 (Supp. 1981), make no such requirement in the sentencing phase of the trial." 432 So.2d at 442. Billiot v. State, 454 So.2d 445 (Miss. 1984); Wilcher v. State, 448 So.2d 927 (Miss. 1984). The Hill Court cited Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982) in which the Fifth Circuit Court of Appeals rejected a similar claim.
This Court recently addressed an identical claim in Jordan v. State, 464 So.2d 475 (Miss. 1985) in which the claim was resolved against the appellant. The majority rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute.
Following the rule above, the appellant's claim has no merit, and this Court affirms the court's instruction C-3A.

IX., X., AND XI.
Was the verdict of the jury against the overwhelming weight of the evidence, imposed as a result of passion, prejudice and/or some other arbitrary factor, or unsupported by the evidence?
Appellant combines his next assignments of error and contends that there was insufficient evidence to support the jury's finding that the capital offense was especially heinous, atrocious, or cruel.
Was the evidence insufficient to support the jury's finding that the capital offense was especially heinous, atrocious, or cruel?
Wiley relies primarily on Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Godfrey involved a situation in which the defendant, having experienced marital problems, went to a trailer where his wife, mother-in-law, and daughter were located. Upon arrival there the defendant shot through the window hitting his wife in the head with a shotgun, killing her instantly, and then proceeded into the trailer where, after striking and injuring his fleeing daughter with the barrel of the gun, he shot his mother-in-law in the head, also killing her instantly.
At Godfrey's trial, the jury imposed the death penalty for both convictions, specifying the aggravating circumstance that the murders were "outrageously or wantonly vile, horrible and inhuman." The Georgia Supreme Court affirmed both sentences.
The United States Supreme Court reversed Godfrey's sentence holding that "the death sentences could not be upheld on the ground that the murders were `outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind,' since the crimes could not be said to have reflected a consciousness materially more `depraved' than that of any person guilty of murder." 446 U.S. at 421, 100 S.Ct. at 1761, 64 L.Ed.2d at 399.
By analogy, Wiley argues that the murder he committed does not rise to the level of "especially heinous, atrocious, or cruel," because it did not involve any more depravity of mind than any other murder.
The State distinguishes Godfrey on two grounds. First, the State argues that the Godfrey decision rests on the uniqueness of the Georgia statute which allows any first degree murder to be elevated to capital murder upon proving certain aggravating *353 factors. That elevation, according to the State, allows wholly unchanneled jury action. "Conversely, in Mississippi, channeling occurs in the initial portions of our statute, whereby only a limited class of crimes may even be indicted as capital offenses."
The State next distinguishes Godfrey on the fact that in Godfrey there was only one aggravating factor. The State argues, "Furthermore, in Godfrey, `heinous, atrocious, or cruel' was the only factor even considered by the jury, an unusual factual scenario which has never occurred in any Mississippi capital case, due to the narrowing accomplished by the primary definition in M.C.A. § 97-3-19... ."
The State in the present case concludes by stating that Edwards and Gilliard are "substantial mirrors of the facts now at bar and control the granting of such instruction and the return of a related verdict herein."
As noted previously, the United States Supreme Court in Godfrey v. Georgia mandated that States, "must channel the sentencer's discretion by `clear and objective standards' that provide `specific and detailed guidance,' and that `make rationally reviewable the process for imposing a sentence of death.'" 446 U.S. at 428, 100 S.Ct. at 1764, 64 L.Ed.2d at 406. (Footnotes omitted).
Several years prior to Godfrey v. Georgia the Florida Supreme Court in State v. Dixon, 283 So.2d 1 (Fla. 1973) interpreted the terms heinous, atrocious, and cruel in the following manner:
Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily tortuous to the victim.
Id. at 9.
The interpretation of the Florida Supreme Court was subsequently adopted by the Fifth Circuit Court of Appeals in Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), which was adopted by the Mississippi Supreme Court in Coleman v. State, 378 So.2d 640 (Miss. 1979).
Recently this Court reaffirmed its adoption of the Spinkellink interpretation in Jordan v. State, 464 So.2d 475 (Miss. 1985) and Mhoon v. State, 464 So.2d 77 (Miss. 1985). In Mhoon, after holding that the statutory language "especially heinous, atrocious, or cruel", was not so vague and overbroad as to violate the United States Constitution,[2] the court recommended to the bench that a jury considering whether to impose the death penalty on this ground should be informed of the construction given that language by this Court in Coleman.
The evidence in the present case indicates that the shooting of J.B. Turner took place in an ambush-type manner without any warning to the victim. Three shots were fired at Turner "one right after the other." From Wiley's statement it appears that Mr. Turner did not die instantly,[3] but from the testimony of Patricia Harvey it appears that Mr. Turner died shortly after being shot.[4]
*354 The question remains whether these facts give rise to the conclusion that this murder was a "conscienceless or pitiless crime which [was] unnecessarily tortuous to the victim." Spinkellink, 578 F.2d at 611.
The facts of the present case are similar to the facts in Edwards, in which this Court concluded that under the undisputed evidence of that case, the aggravating circumstance of "especially heinous, atrocious, or cruel," was proper. This Court so hold in this case.
Having thoroughly reviewed the record, briefs, and arguments, this Court finds that the record supports the aggravating circumstances found by the jury and that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

XII.
Considering both the crime and the defendant, is the sentence of death disproportionate to the penalty imposed in similar cases?
In speaking of the Supreme Court's review of the imposition of the death penalty, Miss. Code Ann. § 99-19-105(3) (Supp. 1985) provides:
With regard to the sentence, the court shall determine:
.....
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Wiley, under this proposition, relies primarily on Coleman v. State, 378 So.2d 640 (Miss. 1979), in which this Court set aside the death sentence and remanded the case for modification of the sentence to imprisonment for life. In Coleman, the defendant and a friend broke into a house while the occupants were away. Unable to locate a money box in the house, the two broke into a truck parked nearby in the driveway. Before the two could enter the truck, the occupants of the house, Mr. and Mrs. Burkett, drove up into the driveway. The burglars tried to hide but were unsuccessful. Upon seeing the protruding foot of one of the burglars, Mr. Burkett began firing his .38-caliber pistol. Coleman returned fire with a .410-gauge shotgun while the other burglar escaped.
When Mrs. Burkett, who had gone inside, heard the shots she rushed outside and saw Coleman squatting behind the truck. She recognized him, having known him since he was a child. Coleman, approximately fifteen feet from her, aimed the shotgun at her face and could have killed her, but instead ran away.
Mr. Burkett died as a result of a gunshot wound to his head. Coleman was convicted for capital murder and was sentenced to die. After examining Irving v. State, 361 So.2d 1360 (Miss. 1978), Washington v. State, 361 So.2d 61 (Miss. 1978), and Bell v. State, 360 So.2d 1206 (Miss. 1978), this Court held:
Having carefully compared the case at bar with these cases in which the sentence of death was imposed, we are of the opinion that the sentence of death in this case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Coleman, 378 So.2d at 650.
Wiley claims his case is virtually identical to Coleman and that his death sentence should likewise be modified to life in prison. Distinguishing facts exist in the instant case, however, which weigh against the defendant's analogy. Coleman was sixteen years old, as opposed to Wiley's twenty-six years. The victim in Coleman fired first, while Wiley ambushed his victim *355 without warning. Coleman robbed an unoccupied house, while Wiley lay in wait with a loaded shotgun. The facts distinguish these two cases.
Under the statutory duty of Miss. Code Ann. § 99-19-105 (Supp. 1985), this Court must determine whether the sentence imposed here is excessive or disproportionate to the penalty imposed in similar cases since Jackson v. State, 337 So.2d 1242 (Miss. 1976). This comparison is made from cases in which the death sentence was imposed and was reviewed on appeal by this Court.
In making this individualized comparison, this Court considers the crime and the defendant. Cabello v. State, 471 So.2d at 332; Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In so doing, the comparison leads this Court to conclude that the death sentence upon this defendant is not excessive or disproportionate. Our review reveals nothing that would justify treating this defendant differently from any other defendants given the death penalty since Jackson v. State, nor leads this Court to conclude that the defendant should receive a life sentence.
In conclusion, this Court is of the opinion that there is no reversible error in this record on retrial of the sentencing phase of William Wiley's capital murder charge. His guilt was previously established and affirmed. Wiley v. State, 449 So.2d 756 (Miss. 1984). Wiley's sentence of death is now affirmed.
AFFIRMED AND WEDNESDAY, MARCH 12, 1986 IS SET AS THE DATE FOR EXECUTION OF THE SENTENCE AND INFLICTION OF THE DEATH PENALTY IN THE MANNER PRESCRIBED BY LAW.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and ANDERSON, J., concur.
ROBERTSON, DAN M. LEE and SULLIVAN, JJ., concur in §§ I through VII and concur in result of §§ VIII through XII.
HAWKINS, J., not participating.

APPENDIX A
DEATH CASES AFFIRMED BY THIS COURT:

Johnson v. State, 477 So.2d 196 (Miss. 1985); Gray v. State, 472 So.2d 409 (Miss. 1985); Cabello v. State, 471 So.2d 332 (Miss. 1985); Jordan v. State, 464 So.2d 475 (Miss. 1985); Wilcher v. State, 455 So.2d 727 (Miss. 1984); Billiot v. State, 454 So.2d 445 (Miss. 1984); Stringer v. State, 454 So.2d 468 (Miss. 1984); Dufour v. State, 453 So.2d 337 (Miss. 1984); Neal v. State, 451 So.2d 743 (Miss. 1984); Booker v. State, 449 So.2d 209 (Miss. 1984); Wilcher v. State, 448 So.2d 927 (Miss. 1984); Caldwell v. State, 443 So.2d 806 (Miss. 1983); Irving v. State, 441 So.2d 846 (Miss. 1983); Tokman v. State, 435 So.2d 664 (Miss. 1983); Leatherwood v. State, 435 So.2d 645 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Pruett v. State, 431 So.2d 1101 (Miss. 1983); Gilliard v. State, 428 So.2d 576 (Miss. 1983); Evans v. State, 422 So.2d 737 (Miss. 1982); King v. State, 421 So.2d 1009 (Miss. 1982); Wheat v. State, 420 So.2d 229 (Miss. 1982); Smith v. State, 419 So.2d 563 (Miss. 1982); Johnson v. State, 416 So.2d 383 (Miss. 1982); Edwards v. State, 413 So.2d 1007 (Miss. 1982); Bullock v. State, 391 So.2d 601 (Miss. 1980); Reddix v. State, 381 So.2d 999 (Miss. 1980); Jones v. State, 381 So.2d 983 (Miss. 1980); Culberson v. State, 379 So.2d 499 (Miss. 1979); Gray v. State, 375 So.2d 994 (Miss. 1979); Jordan v. State, 365 So.2d 1198 (Miss. 1978); Voyles v. State, 362 So.2d 1236 (Miss. 1978); Irving v. State, 361 So.2d 1360 (Miss. 1978); Washington v. State, 361 So.2d 61 (Miss. 1978); Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE:

West v. State, 485 So.2d 681 (Miss. 1985); Fisher v. State, 481 So.2d 203 (Miss. 1985); Johnson v. State, 476 So.2d 1195 *356 (Miss. 1985); Fuselier v. State, 468 So.2d 45 (Miss. 1985); West v. State, 463 So.2d 1048 (Miss. 1985); Jones v. State, 461 So.2d 686 (Miss. 1984); Moffett v. State, 456 So.2d 714 (Miss. 1984); Lanier v. State, 450 So.2d 69 (Miss. 1984); Laney v. State, 421 So.2d 1216 (Miss. 1982).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:

Edwards v. State, 441 So.2d 84 (Miss. 1983); Dycus v. State, 440 So.2d 246 (Miss. 1983); Coleman v. State, 378 So.2d 640 (Miss. 1979).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:

Pinkton v. State, 481 So.2d 306 (Miss. 1985); Mhoon v. State, 464 So.2d 77 (Miss. 1985); Cannaday v. State, 455 So.2d 713 (Miss. 1984); Wiley v. State, 449 So.2d 756 (Miss. 1984); Williams v. State, 445 So.2d 798 (Miss. 1984).
ROBERTSON, Justice, concurring:

I.
I concur in the judgment we announce this day and in much of the opinion of the majority. Yet, with respect to four of the propositions advanced by Wiley and rejected today, propositions which have been rejected when presented heretofore, I have grave concerns regarding our manner of enforcement of our capital murder statute. I concur because the Court has authoritatively, though neither correctly nor rationally, resolved each of these four issues. I am bound under stare decisis, at least for today.
With five cases decided July 2, 1976  see particularly Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); and Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), mandatory capital sentencing schemes were held unconstitutional and we entered formally the era of individualized, guided discretion capital sentencing. The fundamental premise of these cases was that, one feature which must be incorporated into any state capital sentencing scheme passing constitutional muster was a series of rational guidelines which could be applied to all murders and winnow out those qualitatively more reprehensible and expose only persons committing those to the ultimate sanction. This premise has been incorporated into the positive law of this state by legislative fiat. See Miss. Code Ann. §§ 99-19-101, et seq. (Supp. 1985).
This state's experience with implementation of that legislatively approved premise has been spotty and provides evidence of the perceptiveness of Holmes' sage observation that the life of the law has been experience, not logic.[1] Still, I have never understood illogic to be a virtue or an end that ought consciously be pursued within our law.
I write separately to emphasize four areas wherein  whether intentionally or not  we[2] have this day continued to allow our capital murder statute to evolve along lines that are essentially irrational and unreasoned. Our failings have been two-fold. First, we have engrafted four legally unsound constructions upon our capital sentencing statute. Second, perhaps more fundamentally, in none of these four areas have we employed a semblance of legal reasoning or juridical logic to explain why we have done what we have done. In sum, the quality of much of the post-Gregg state *357 statutory construction law we have developed is less than impressive.
Perhaps the lesson of the ten years since Gregg is that the elimination of whim and caprice from such a system is an impossibility.[3] My point for today is that this Court's stewardship of our capital sentencing system has allowed enough procedural imperfections to creep in that we may never know whether or how well a theoretically ideal guided discretion capital sentencing system could work.
The primary addressees of these remarks are the trial judges who will shoulder the responsibility of presiding over capital murder trials in the future. As will become apparent from what follows, the trial judges could begin uprooting at least three of these irrationalities from our capital sentencing system tomorrow, without unfair prejudice to any party and with next to no risk of reversal here.

II.
Without further preliminary ado, what are these irrationalities now infecting our capital sentencing system? Three such problems arise in the weighing and balancing of aggravating and mitigating circumstances. Miss. Code Ann. § 99-19-101, et seq. (Supp. 1985).

A. Robbery vs. Pecuniary Gain: Herein Of The Stacking Of Aggravating Circumstances
By statute the sentencing jury may consider only eight possible circumstances that may aggravate the murder so that the death penalty may be imposed. True, the balancing process is not to be performed mathematically. See Tokman v. State, 435 So.2d 664, 669 (Miss. 1983). Still no one doubts that the side with the largest number of "circumstances" has a practical advantage before the sentencing jury.
The specific problem is that we have construed our statute to authorize a single factual circumstance to generate two legally separate and distinct aggravating circumstances. Such stacking stacks the deck and skews the jury's discretion in favor of death.[4]
I refer here to the two statutory aggravating circumstances:
(d) The capital offense was committed while the defendant was engaged ... in the commission of . .. any robbery... .
* * * * * *
(f) The capital offense was committed for pecuniary gain.
Miss. Code Ann. § 99-19-101(5) (Supp. 1985).
Despite the force of substantial logic to the contrary, see Provence v. State, 337 So.2d 783, 786 (Fla. 1976), we have repeatedly held, as we do today, in the case of a capital murder arising out of an armed robbery, that the State is entitled to the opportunity to convince the jury that it should find both of these aggravating circumstances. Smith v. State, 419 So.2d 563, 568 (Miss. 1982) is our earliest case on the point. Without offering so much as a whisper why, Smith dismisses the stacking argument as having "no merit". 419 So.2d at 568. Gilliard v. State, 428 So.2d 576, 586 (Miss. 1983) follows suit, again offering no reasoning. Gilliard claims that Smith decided the point on the authority of two prior cases, in neither of which was the point an assigned error nor was its logic discussed. Voyles v. State, 362 So.2d 1236, 1244 (Miss. 1978); Bell v. State, 360 So.2d 1206, 1213 (Miss. 1978).
To say, as we have in Booker v. State, 449 So.2d 209, 221 (Miss. 1984) and Tokman v. State, 435 So.2d 664, 669 (Miss. 1983), that "the robbery was committed for pecuniary gain" is bootstraps logic at its worst. Section 99-19-101(5)(f) allows pursuit of pecuniary gain to be considered as an aggravating circumstance only where "the capital offense was committed for pecuniary gain". Robbery, of course, is not the capital offense but is itself merely another aggravating circumstance that, when coupled *358 with the murder, may expose the defendant to the death penalty. Compare Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).
Our present course is illogical because the very structure of the act contemplates eight distinct aggravating circumstances. That they are listed in eight separate paragraphs makes clear that they are considered as eight separate categories of circumstance. Each has been designed by our legislature to perform the narrowing function constitutionally mandated by Gregg and progeny. Yet aggravating circumstances (d) and (f) have become so coalesced in our decisions that it is difficult, if not impossible, to imagine an armed robbery capital murder wherein the accused may not be said, in accordance with our reading of the language, to have committed his offense for pecuniary gain.
The language "the capital offense was committed for pecuniary gain" should exclude armed robbery capital murders, not include them. The robbery in such case is no doubt committed for pecuniary gain; indeed, such is the essence of the crime of robbery. The murder, however, is surely committed to silence witnesses, to facilitate escape, or to avoid prosecution, or, when the perpetrator panics, for no reason at all.
Anyone familiar with the evolution of the "pecuniary gain" concept in capital murder litigation around the country is aware that this aggravating circumstance was not designed for application to the armed robbery capital murder. Rather, this language contemplates the hired killing or, as it is sometimes called, the contract murder. It might also apply to a murder motivated by a desire to collect life insurance proceeds. Such an approach to subsection (f) would be consistent with correct grammatical usage of the words employed and with the idea that aggravating circumstances are intended to focus the jury's attention upon aspects of a murder thought to render it a more reprehensible act than is murder per se.
In the end, the fallacy of our rule is its failure to recognize that murders are aggravated by a defendant's conduct, not by statutory language. Regardless of the label put on it, the defendant's taking of the victim's money is what aggravates the murder. A single, legally indivisible act of the defendant may rationally aggravate a murder but once.
On a deeper level, the problem with our handling of this issue is that no decision of this Court begins to explain why the above reasoning is not correct. This is so despite the fact that numerous appellants have pressed the point, and persuasively so. We have forgotten that indispensably a part of the judicial task is the employment of accepted techniques of legal reasoning to explain the bases of our decisions. At stake is nothing less than the integrity of the process. One of the assaults perennially made against judges is that their decisions emanate from a conjunction of judicial power and personal and political prejudices. Cynics who hold such a view of the judiciary would claim vindication in a review of our cases on the point at issue. Today's decision marks the ninth time we have considered this issue. Each case simply relies upon a prior case as authority for affirmance. Yet not one of those opinions has ever stopped to employ neutral, non-result oriented techniques of legal reasoning, to explain the basis of rule we have chosen to follow. With issues such as this we are on our oaths required, somewhere along the line, to do more than merely recite the assignment of error and hold it "without merit".

B. "Especially Heinous, Atrocious Or Cruel": The Aggravating Circumstance Which Was Intended To Guide The Sentencing Jury's Discretion But Which As Practice Provides No Guidance At All
We have gotten ourselves into another linguistic bog in the case of aggravating circumstance (h): "The capital offense was especially heinous, atrocious or cruel."[5] Miss. Code Ann. § 99-19-101(5)(h) (Supp. *359 1985). We went astray when we failed almost from the outset to afford any practical meaning to the critical word of the statute: "especially". Put another way, we have allowed to creep into our juridical thinking the layman's intuitively correct notion that every murder is, by definition, "heinous, atrocious or cruel". See Johnson v. State, 477 So.2d 196, 217 (Miss. 1985). Indeed, if a killing is one a layman would not describe by one or more of these adjectives, it would almost surely not be murder.
Above we considered aggravating circumstances which, according to the practice we sanction, irrationally guide the jury's discretion in favor of death. Here we confront a statutory aggravating circumstance which, though designed to narrow the jury's focus, in fact does no narrowing at all. On more than one occasion members of the Court have asked counsel for the State in the course of oral argument to name or describe a capital murder case that the State would concede is not "especially heinous, atrocious or cruel". Out of the 50 or so capital murder cases we have seen in this state, counsel have never been able to mention more than one or two.[6] The State's brief in the case at bar inadvertently confesses the point when it itemizes at least 20 separate occasions wherein this Court had ratified "especially heinous, atrocious or cruel" jury findings. See Brief for Appellee, filed July 11, 1985, pp. 13-15. Every case is especially heinous, atrocious or cruel, or at least we refuse to vacate the findings which in the aggregate have so held.
We began our present course in Washington v. State, 361 So.2d 61 (Miss. 1978). We rejected a plea that the words "especially heinous, atrocious or cruel" were vague and in need of further refinement, giving our opinion that these words were
not confusing nor likely to be misunderstood by the average citizen.
361 So.2d at 65.
On at least three subsequent occasions, see Edwards v. State, 441 So.2d 84, 90 (Miss. 1983); Irving v. State, 441 So.2d 846, 849 (Miss. 1983); Booker v. State, 449 So.2d 209, 220 (Miss. 1984), we have merely recited the Washington language as though Washington's saying it makes it so  notwithstanding an ever emerging reality to the contrary. However reasonable the prediction of the Washington court may have been in 1978, experience has shown it wide of the mark. The average citizens who have served on our capital sentencing juries demonstrably have misunderstood the statutory language in that, in the aggregate, they have ignored the law and acted upon the layman's intuitive notion that all murders are heinous, atrocious or cruel. There is no evidence that this aggravating circumstance has in any way served to narrow or guide rationally the jury's sentencing discretion. Likely, one of the reasons for this aggregate jury behavior has been the absence of jury instructions explaining adequately the import of the word "especially".
This Court had the opportunity to give "especially heinous, atrocious or cruel" a rational construction in Edwards v. State, 441 So.2d 84, 90 (Miss. 1983). As the majority today notes, Coleman v. State, 378 So.2d 640 (Miss. 1979); Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978) and State v. Dixon, 283 So.2d 1 (Fla. 1973), all read in the light of the constitutional parameters articulated in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) lighted the way. By a five to four vote, however, we rejected that course in Edwards and opened the door to our present plight where almost every capital murder is especially heinous, atrocious or cruel. This is so even though the language of the statute, as well as its logical scheme, make clear that aggravating circumstance (h) was intended to apply only to those capital murders qualitatively more heinous, atrocious and cruel than murder itself, all matters we seem bent on keeping well concealed from our juries.
*360 A part of my present concern is, again, that we decide this point in case after case without an adequate rationale. Washington's predication that lay jurors will understand it and apply it correctly fails in the face of our experience. No case since has explained why we should continue on this course. The Edwards majority discusses the point, 441 So.2d at 90-91, but relies on Washington, then proceeds to confuse the issues of
(a) whether an adequate instruction on `especially heinous, atrocious or cruel' has been given, with
(b)(1) whether the evidence on the issue of `especially heinous, atrocious or cruel' was legally sufficient, assuming a correct jury instruction, and
(2) whether there was present another aggravating circumstance that would `save' the death sentence if for any reason the `especially heinous, atrocious or cruel' circumstance fell by the wayside.
Subsequent opinions, including today's, merely cite Edwards and move on to the next point.
The way out is for the trial judges of this state to begin giving meaning to the word "especially" in their instructions to the jury. Acceptable substantive language appears in Coleman v. State, 378 So.2d 640, 648 (Miss. 1979) and in the dissent in Edwards v. State, 441 So.2d 84, 94-96 (Miss. 1983). Employment of such language just might enhance the quality of our guided discretion capital sentencing system with no practicable risk of harm or reversal.[7]

C. There Must Be Some Burden Of Proof At Sentencing
Here, as in so many other capital murder trials, the jury was given no burden of proof guidance regarding the weighing and balancing of mitigating circumstances  who has the burden and what is the content of that burden?[8]
Two separate and distinct questions are presented. First, should the jury be instructed that there is any burden of proof at all involved in their weighing and balancing aggravating circumstances and mitigating circumstances? Only if this question is answered in the affirmative do we reach the second question: what should that burden of proof be and upon whom should it rest?
I am concerned about the failure of our trial courts in the sentencing phase of capital murder trials to give the jury any instruction at all regarding the burden of proof to be applied. I am not aware of any other situation in which an issue to be resolved by the jury where the trial court does not advise the jury of the applicable burden of proof, and upon whom it rests. It appears to me that we have here one of the remaining vestiges of the "unfettered discretion" death sentencing system condemned back in 1972 in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
It is no answer to say that the jury is instructed in the language of the statute. See, e.g., Wilcher v. State, 448 So.2d 927, 939 (Miss. 1984). We have venerable authority for the proposition that trial judges can and must supplement statutory language where necessary in order that the jury be correctly instructed. Jackson v. State, 337 So.2d 1242, 1254-55 (Miss. 1976). Moreover, burden of proof instructions in criminal cases almost never have a statutory base.
I would hold that the State has the burden beyond a reasonable doubt. Several members of the Court have dissented on this point in the past. See Justice Hawkins' *361 dissent in Hill v. State, 432 So.2d 427, 457-58 (Miss. 1983) and my dissent in the same case, 432 So.2d at 451-52. My concern for the moment is that, as an integral part of any guided discretion capital sentencing system, there must be a clear instruction to each jury who has the burden on balancing and what that burden is.

D. Proportionality Review: A State Statutory Mandate That Those Who Must Die Not Be Chosen By The Luck Of The Draw
The practice of proportionality review we likewise administer in such a way that whim and caprice creep into the winnowing out process.[9] Though undergirded by no constitutional imperative, see Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the practice emanates from our legislature which has mandated that, with respect to each death sentence, this Court
... determine ... whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Miss. Code Ann. § 99-19-105(3)(c) (Supp. 1985).
In the case at bar we discharge our sentencing responsibility by a careful consideration of four prior cases said to be similar. In the end we merely list all of the death penalty cases we have decided since enactment of the revised statute post-Gregg. More normally we merely recite that the penalty is not "disproportionate" to the sentences in other cases and then list our other death penalty cases. See, e.g., Gray v. State, 472 So.2d 409, 423-24 (Miss. 1985); Stringer v. State, 454 So.2d 468, 479, 481 (Miss. 1984).
Since Gregg we have on the merits decided some 52 death penalty cases, 32 of which have been affirmed. Candor requires an admission that comparison of the crime and the defendant of this case with each of the 52 cases would require inordinate time and effort. Our burden is arithmetically enhanced with each new case.
My concern, however, is not so much that we may struggle under the weight of proportionality review. We have been presented a statutory mandate which I do not understand to be optional. Section 99-19-105(3)(c) requires that we review "all similar cases". With respect both to the case under review and those with which that case is compared, we are directed to consider "both the crime and the defendant". As Appendix A to the opinion of today's majority makes clear, however, we include in our proportionality review some cases that are not similar and exclude others that are.
A listing of that handful of death penalty cases we have reversed on the guilt phase is irrelevant, though no doubt interesting. Because the ultimate outcome of these cases is not known, there is no final sentence which may be compared with that in the case at bar. The same may be said of cases where we have affirmed the judgment of conviction and reversed only the sentence, the case being remanded for a new sentencing hearing. See Stringer v. State, 454 So.2d 468, 479 (Miss. 1984) and Dufour v. State, 453 So.2d 337, 347 (Miss. 1984).
Of greater concern is our refusal to include in proportionality review those capital murder cases which have resulted in affirmed life sentences. Such cases are to my mind "similar cases" within Section 99-19-105(3)(c). Certainly the crime is legally the same: capital murder. More important, the facts and circumstances of such cases may well be quite similar with those wherein the death sentence has been imposed. A comparison or contrast of such cases with a given death penalty surely would reveal valuable information regarding the proportionality of the sentence under review.
It may well be that capital murder/life cases, considered as a group, are ones where the accused's participation in the murder was qualitatively lesser than those *362 cases where the death penalty has been imposed. See, e.g., Fairchild v. State, 459 So.2d 793 (Miss. 1984). Such a finding might well suggest affirmance of a given death sentence. By way of contrast, we have some capital murder/life cases where the murder absolutely by any criteria was especially heinous, atrocious and cruel. See, e.g., Ruffin v. State, 447 So.2d 113 (Miss. 1984). And, what are we to make of the other capital murder/life results in other convenience store robbery/killings not qualitatively less reprehensible than that here? See, e.g., Swanier v. State, 473 So.2d 180 (Miss. 1985). Where we confront such situations it is no longer sufficient to give the shop worn answer that different juries have the prerogative of deciding comparable cases differently. Proportionality review has been instituted among men as a mandate that we do more than wring our hands and mutter something about luck of the draw. If it has any purpose, Section 99-19-105(3) has been fashioned to ameliorate the arbitrary results necessarily attendant upon individualized verdicts returned by separate juries.
Here again we confront a perfectly rational proposition  that all capital murder convictions are "similar cases" within Section 99-19-105(3)  a proposition rational in the sense that it is wholly consistent with and supportive of the goals of a guided discretion capital sentencing system. Again we have rejected it without a semblance of resort to the process of reasoned elaboration.
Jordan v. State, 464 So.2d 475, 486-87 (Miss. 1985) is the primary offender. Jordan notes that there is no federal constitutional mandate for this dimension of proportionality. I would agree, and for that reason point out that the federal cases cited in Jordan are irrelevant to what is wholly a question of state statutory construction. We repeat the offense in Gray v. State, 472 So.2d 409, 420 (Miss. 1985), which also cites Pulley v. Harris for the proposition that proportionality review is "not constitutionally mandated, being exclusively a question of state law". 472 So.2d at 420. The Gray court acknowledged
that it had been urged ... that Mississippi Code Annotated § 99-19-105(3)(c) (Supp. 1984), requires us to compare his death penalty with all capital murder cases, even though a life sentence is imposed... .
472 So.2d at 420.
Our Gray answer to this question of pure state law is given, without citation of any state authority, without a semblance of rationale or explanation.
We find no basis in this assignment of error and it is rejected.
472 So.2d at 420.
Jordan doesn't say that much. 464 So.2d at 487.
In sum, once again we have no case which employs neutral non-result oriented legal reasoning and explains why capital murder/life cases are not similar cases for purposes of our review responsibilities under Section 99-19-105(3). Here, however, we cannot ask the trial judges to bail us out. Proportionality review is in our house which only we may set in order.

III.
One of the sources of these missteps has been our misperception of our function as the highest court of this state. All too often our focus has been too glued to the task of deciding the case before us. We neglect the inexorable reality that each issue we decide establishes a rule of law which affects all future cases throughout the state.
With the advantage of twenty-twenty hindsight, a few more reversals early on may have produced temporary inconvenience but would have laid the groundwork for several long range ends generally thought desirable. The nuances of our capital murder statute would have been settled in a way that would have all but eliminated the "construction" questions still regularly assigned. The pursuit of the Gregg-Woodson goal of guided discretion, individualized sentencing would have been greatly *363 enhanced. The logical flaws that have come to infect the system could have been thwarted from the outset.
Our sub silentio approach in the past seems almost to have been, because the suggested errors are largely procedural, if not linguistic, is there not some way we can "save" this conviction and sentence? The nature of a court such as ours, however, would have seemed to mandate that, so long as we do not sacrifice the defendant on grounds of expediency, our greater focus in each case should be, is the rule of this case likely to enhance the future fairness and rationality of our guided discretion capital sentencing system?
In the end I concur reluctantly  only because these points have been ruled on so many times. Yet I see no reason why the judicial eye should be permanently blinded to problem areas so demonstrably present in our capital sentencing system. I regard it an article of faith that our law is a purposeful enterprise, dependent for its success on the energy, insight, intelligence and conscientiousness of those who conduct it, and fated, because of this dependence, always to fall short. Realizing these things I would hope that we might make such mid-course correction as might be necessary to redirect our aim toward the ideal guided discretion capital sentencing system.
DAN M. LEE and SULLIVAN, JJ., join in this opinion.
HAWKINS, J., not participating.
NOTES
[1] Caldwell was recently reversed in part by the United States Supreme Court in Caldwell v. Mississippi, ___ U.S. ___, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Court found it reversible error for the prosecutor to inform the jury of the automatic reviewability of the sentence by the State Supreme Court.
[2] Billiott v. State, 454 So.2d 445 (Miss. 1984); Coleman v. State, 378 So.2d 640 (Miss. 1979); Washington v. State, 361 So.2d 61 (Miss. 1978).
[3] On page three (3) of the statement Wiley gave to Ray Richardson and Jerry W. Stewart, Wiley was asked if Mr. Turner was alive and talking when Wiley left the scene. Wiley responded, "Naw, he was just laying there. He was still grunting a little low scream you know UHHHHHHH! like that." (R. 600).
[4] Mrs. Harvey testified that after the three shots were fired, "there was just quiet. I mean  I heard footsteps and I was laying down on the ground on the other side of the car and I laid there, you know, until everything was quiet for several minutes." (R. 803) Later in the testimony of Mrs. Harvey the following question and answer was given:

"Q. Mrs. Harvey, after the first shot was fired, were you able to locate your father; did you know where he was and what had happened to him?
A. Well, I didn't know where he was, but I knew he couldn't hear, so ..." (R. 805)
[1] In 1881 Holmes first said this in The Common Law on page one: "The life of the law has not been logic: it has been experience." Forty years later he repeated the point more metaphorically: "... [A] page of history is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963, 983 (1921).
[2] When I say "we" I include myself, for I have voted for many of the opinions I criticize below. I write as a judge-penitent. Camus, The Fall (1956).
[3] See Black, Capital Punishment: The Inevitability Of Caprice And Mistake (1974).
[4] This proposition is considered and rejected by today's majority on pages 351-352.
[5] This point is considered and rejected by today's majority at pages 352-354.
[6] The only one I recall being suggested in this context is the case of Walter Williams, Jr. Williams v. State, 445 So.2d 798 (Miss. 1984).
[7] We have held that the defendant is not of right entitled to the so-called mercy instruction. See Johnson v. State, 477 So.2d 196, 221-22 (Miss. 1985); Bullock v. State, 391 So.2d 601, 610 (Miss. 1980). Where such an instruction is given, however, we do not reverse. See Wilcher v. State, 448 So.2d 927, 940 (Miss. 1984); Irving v. State, 441 So.2d 846, 851 (Miss. 1983); Tokman v. State, 435 So.2d 664, 671 (Miss. 1983). This is an example of what is meant by "no risk of reversal".
[8] This point is considered and rejected by today's majority at page 352.
[9] Proportionality review is considered by today's majority at pages 354-355.